JAMES G. O'DONNELL, Plaintiff-Appellant, v. FIELD ENTERPRISES, INC., et al., Defendants-Appellees.

First District (3rd Division)   No. 83—2807

Opinion filed March 26, 1986.

McNAMARA, J., specially concurring.

Rick M. Schoenfield and Donna R. Lipshutz, of Chicago, for appellant.

Lawrence Gunnels, Samuel Fifer, and Charles C. Post, of Chicago, for appellees Chicago Tribune Company, Stanton R. Cook, James D. Squires, Charles T. Brumback, William H. Jones, Lynn Emmerman, Thomas Powers, CBS Inc., and Walter Jacobson.

Daniel S. Hefter and Irene B. Cramer, both of Isham, Lincoln & Beale, of Chicago, for other appellees.

PRESIDING JUSTICE RIZZI delivered the opinion of the court:

This is an appeal from the dismissal of plaintiff James G. O'Donnell's libel action filed in 10 counts against defendants Field Enterprises, Inc., James Hoge, Ralph Otwell, Gregory E. Favre, Lois Wille, Jim Casey, Maurice Possley, Tom Page Seibel, Michelle Stevens, Pat Wingert, Jonathan Landman, Hanke Gratteau, Chicago Tribune Company, Stanton R. Cook, James D. Squires, Charles T. Brumback, William H. Jones, Lynn Emmerman, Thomas Powers, CBS Inc. and Walter Jacobson. The individually named defendants are or were officers, editors or reporters for the respective corporate defendants. We affirm.

During 1981, the Federal Drug Enforcement Administration (DEA) and the Organized Crime Division of the Chicago Police Department (OCD) conducted a joint investigation of unlawful drug activities in the city of Chicago. The joint investigation was given the code name Operation Top Brass.

As a result of Operation Top Brass, on October 13, 1981, the Federal government indicted plaintiff, a medical doctor, in six counts for unlawfully distributing a controlled substance, phendimetrazine. Another medical doctor was indicted in seven counts for unlawfully distributing phendimetrazine. A pharmacist was indicted in five counts for unlawful possession with intent to distribute Talwin tablets. Another pharmacist was charged in a 26-count criminal information with unlawful possession with intent to distribute Talwin tablets and glutethimide, a water insoluble powder used as a hypnotic and sedative. Talwin, when mixed with the blue colored amphetamine pyribenzamine, is known as "T's and Blues," a heroin substitute. On the same day, also as a result of Operation Top Brass, a Cook County grand jury returned indictments against 75 persons for unlawfully dealing in drugs. Many of the persons indicted were members of a Chicago street gang known as the El Rukns.

The United States Department of Justice, through the United States Attorney for the Northern District of Illinois, Dan K. Webb, made an official public announcement of the Federal indictments on October 13, 1981. At about the same time, the Chicago Police Department OCD made several arrests stemming from Operation Top Brass. Later in the day, an OCD police sergeant brought some of the people who were arrested to the narcotics section at police headquarters. The suspects were taken to a processing room where many news media reporters were gathered. There, the sergeant provided information concerning the arrests and Operation Top Brass to the news media reporters. Included in the information was the fact that plaintiff

had been indicted as part of the joint Federal and local investigation.

Based upon the information that the news media reporters obtained from both the Federal and local governmental and public proceedings, on October 14 through October 16, 1981, the Chicago Tribune and the Chicago Sun-Times newspapers printed news headlines and articles regarding Operation Top Brass. The articles included the fact that plaintiff was indicted as part of the special drug investigation. On October 13 and October 14, Walter Jacobson, a newscaster for CBS affiliate WBBM-TV, also reported about the events of the Operation Top Brass investigation and the resulting indictments and arrests. The relevant newspaper articles are included as exhibits to plaintiff's amended complaint, and they are reproduced here as an appendix. However, the complaint does not allege or quote any specific statements that were made by Jacobson during his televised newscasts. In March 1982, plaintiff was tried on the six-count indictment in the Federal district court, and he was found not guilty on all counts. Thereafter, plaintiff filed this libel action.

We agree with plaintiff that his complaint sufficiently alleges that the statements about him in the newspaper articles are factually false and defamatory. However, we believe that what is at issue here is not whether the news media reports are factually false, but whether defendants are protected from a libel action by a privilege based upon the news media's first amendment right to report governmental and public proceedings that deal with matters of public concern. See *Cox Broadcasting Corp. v. Cohn* (1975), 420 U.S. 469, 495, 43 L. Ed. 2d 328, 349-50, 95 S. Ct. 1029, 1046.

■ Plainly, the news media's constitutional right to report governmental and public proceedings is rendered ineffectual unless the right is expansive enough to enable the news media to report news from the proceedings untrammeled by the specter of a libel action. Thus, there is a special privilege that protects the news media from libel actions when it publishes information obtained from governmental and public proceedings that deal with matters of public concern. Restatement (Second) of Torts sec. 611 (1977);[1] see *Cox Broadcasting Corp. v. Cohn* (1975), 420 U.S. 469, 495-96, 43 L. Ed. 2d 328, 349-50, 95 S. Ct. 1029, 1046-47.

While the privilege is not absolute, it is broader in scope than the

---

[1]The Restatement (Second) of Torts sec. 611 (1977) provides: "The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgment of the occurrence reported."

qualified or conditional privileges that are a part of the law of libel.[2] Thus, the privilege exists even though the publisher does not believe that the defamatory statements from the proceedings are true and even though the publisher knows that they are false. (Restatement (Second) of Torts sec. 611, comment a; see W. Keeton, Prosser & Keeton on Torts sec. 115 (5th ed. 1984).) If reports in governmental and public proceedings dealing with matters of public concern are false, the news media must nevertheless be able to report to the people what it sees and hears—the news media's belief or knowledge as to the truth notwithstanding. If the news media cannot report what it sees and hears at governmental and public proceedings merely because it believes or knows that the information is false, then self-censorship by the news media would result. (Compare *Cox Broadcasting Corp. v. Cohn* (1975), 420 U.S. 469, 496, 43 L. Ed. 2d 328, 350, 95 S. Ct. 1029, 1046-47.) The first amendment cannot tolerate a tenet which engenders self-censorship by the news media. *Rosenbloom v. Metromedia, Inc.* (1971), 403 U.S. 29, 50, 29 L. Ed. 2d 296, 315, 91 S. Ct. 1811, 1823.

■ If a news media account is not a complete report of the proceedings, it nevertheless remains under the aegis of the privilege so long as it is a fair abridgment of the proceedings. However, when a news media account is neither complete nor a fair abridgment of the proceedings, then the privilege is lost. (See *Catalano v. Pechous* (1980), 83 Ill. 2d 146, 168, 419 N.E.2d 350, 360, quoting Restatement (Second) of Torts sec. 611 (1977).) Here, it is admitted that the news media accounts are not complete reports of the governmental and public proceedings. Therefore, the critical issue is whether the news media accounts are a fair abridgment of the proceedings and thus protected by the privilege. On defendants' motions to dismiss, we must determine whether there is a genuine and material question of fact on the issue. Compare *Meyer v. Murray* (1979), 70 Ill. App. 3d 106, 114, 387 N.E.2d 878, 884.

■ Plaintiff argues that the newspaper articles are not a fair abridgment of the proceedings because they falsely connect him to the

[2]For convenience, the term libel is being used in this opinion as including slander. In Illinois, all distinctions between libel and slander, except as to whether the defamation was written or spoken, have been abolished and the rules applicable to slander are now applicable to libel as well. (*Mitchell v. Peoria Journal-Star, Inc.* (1966), 76 Ill. App. 2d 154, 158-59, 221 N.E.2d 516, 518-19.) For a discussion as to the common law difference between libel and slander, see *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 369-77, 41 L. Ed. 2d 789, 822-26, 94 S. Ct. 2997, 3022-25 (White, J., dissenting). See also Ill. Rev. Stat. 1985, ch. 126, par. 1 *et seq.*

illicit drug activities of the El Rukn street gang, falsely link him with the unlawful distribution of Talwin, and falsely charge that he was one of the initial sources of such drugs in the distribution chain. Specifically, plaintiff states: "Any and all references to Dr. O'Donnell and his alleged connection with the El Rukn street gang are wholly false. That lack of connection between Dr. O'Donnell and the El Rukn street gang formed the basis for plaintiff's defamation complaint."

To determine whether the newspaper articles are a fair abridgment of the proceedings, the Federal and local governmental and public proceedings must be viewed together. The U.S. Department of Justice Information Release of October 13, 1981, which included the announcement of plaintiff's indictment, the indictments of another doctor and a pharmacist, and the criminal information of another pharmacist, states:

> "Mr. Webb stated that these Federal Charges are the result of a lengthy coordinated investigation by federal and local law enforcement authorities aimed at the illegal distribution of Talwin (a heroin substitute) and other abused controlled substances. Mr. Webb indicated that these types of controlled prescription drugs are sold by 'pill pushers' in Chicago's neighborhoods, and his office is going to vigorously prosecute the medical providers, such as pharmacies and doctors, who are the initial sources of such drugs in the distribution chain.
>
> These indictments resulted from an investigation conducted by the Chicago Office of the Drug Enforcement Administration and the Illinois Department of Law Enforcement."

The affidavit of the Chicago Police Department OCD sergeant states that on October 13, 1981, he gave the news media the following information:

> "The information which I gave to the reporters included the facts that these indictments and arrests were the result of a joint DEA-Chicago Police Department investigation; that many of those indicted for pill-pushing at the street level as a result of the joint investigation were members of the El Rukn street gang; that others indicted for diverting drugs from legitimate uses were doctors, and that others were pharmacists; and the names of several of those indicted as a result of the investigation. Among the names of the indictees which I read to the reporters was that of Dr. James G. O'Donnell."

When the reports of the Federal and local government and public proceedings are read together, the only reasonable conclusion that can be reached is that the gist or sting of the defamation that is conveyed

is the same as the gist or sting of the defamation that is conveyed from the newspaper articles. The gist or sting of the defamation in both instances is that plaintiff is a medical doctor who was indicted by the Federal government and that the Federal charges against plaintiff were a result of a lengthy, coordinated investigation by the Federal government and the Chicago Police Department OCD aimed at the illicit distribution of Talwin (a heroin substitute) and other controlled substances. In addition, the gist or sting of the defamation in both instances includes statements that these types of controlled prescription drugs are sold by pill pushers in Chicago's neighborhoods; that many of those indicted for pill-pushing at the street level were members of the El Rukn street gang; that others indicted as part of the same law enforcement investigation for diverting drugs from legal use included plaintiff; and that the U.S. Attorney's office "is going to vigorously prosecute" the pharmacists and doctors, which included plaintiff, "who are the initial sources of such drugs in the distribution chain." It follows that as a matter of law, the newspaper articles are a fair abridgment of the governmental and public proceedings from which they were made. Whether or not the statements in the newspaper articles are factually false is not relevant.

■ Plaintiff further argues that the newspaper articles state that he was indicted for distributing pyribenzamine, rather than phendimetrazine. However, the newspaper articles do not make that mistake. The newspaper articles state that the pharmacists—not the doctors— were indicted for distributing pyribenzamine. As an example, one newspaper article states: "Federal grand jury indictments also have been returned against two doctors in connection with distribution of a 'speed' derivative, and four pharmacists accused of dealing in 'T's' and 'blues,' Talwin and pyribenzamine, which in combination act like heroin." Moreover, unlike phendimetrazine,[3] pyribenzamine is not a controlled substance. 21 U.S.C. sec. 801 *et seq.* (1982); Ill. Rev. Stat. 1985, ch. 56½, par. 1201 *et seq.*

In addition, we believe that the privilege that exists here is not defeated merely because there may be a misstatement or some discrepancies between the statements in the newspaper articles and the statements from the governmental and public proceedings upon which they are based. No matter how carefully a reporter or publisher attempts to summarize a speech or proceeding, the summary is bound

---

[3]Phendimetrazine is an amphetamine drug which stimulates the central nervous system to control the appetite in the treatment of obesity. It is a controlled substance. 21 U.S.C. sec. 812 (1982); Ill. Rev. Stat. 1985, ch. 56½, par. 1208(b)(5).

to convey a somewhat different impression than the speech or proceeding itself. It is for this reason that first amendment freedoms of speech and of the press must be given breathing space to survive. (See *National Association for the Advancement of Colored People v. Button* (1963), 371 U.S. 415, 433, 9 L. Ed. 2d 405, 418, 83 S. Ct. 328, 338.) Thus, when it comes to these special freedoms, some public misstatements must be tolerated by each of us in order that the freedoms be maintained for all of us. (See *Time, Inc. v. Pape* (1971), 401 U.S. 279, 292, 28 L. Ed. 2d 45, 54, 91 S. Ct. 633, 640.) Within this context, we believe that in order to constitute an unfair abridgment of a governmental or public proceeding so as to defeat the privilege that is involved here, the abridgment must significantly change the defamation appearing in the governmental or public proceeding. With regard to this case, we conclude that any purported misstatement appearing in the newspaper articles does not significantly change the defamation occurring in the governmental and public proceedings.

■ Plaintiff's next argument centers on the editorial printed in the Chicago Sun-Times. Plaintiff argues that the editorial "served to underscore and highlight the falsities published in the news story." Specifically, plaintiff states: "Headlined 'A cheer for T's and blues crackdown,' the editorial focused on the alleged indictment charging plaintiff and other professionals with supplying drugs to the El Rukn gang. The editorial suggested that plaintiff was 'high on the list' of those arrested. Further, the editorial stated, 'We hope the law reserves the utmost scorn—and strongest penalties—for professionals ultimately convicted of helping the El Rukns maintain their drug stranglehold on so many Chicago neighborhoods.' The editorial concluded by hailing the action taken against 'the worst of the T's and blues exploiters in Chicago.' "

We believe that whether the editorial is read independently or in conjunction with the newspaper articles, it cannot form the basis of a libel action because the editorial merely contains the ideas and opinions of the editor. There is no such thing as a false idea or opinion. Thus, expressions of ideas and opinions, even in the most pejorative terms, are protected by the first amendment. No matter how defamatory ideas or opinions may seem, in our system of government we depend for their correction not on the conscience of judges or juries in libel actions, but on the competition of other ideas and opinions. (See *National Association of Letter Carriers v. Austin* (1974), 418 U.S. 264, 284, 41 L. Ed. 2d 745, 761-62, 94 S. Ct. 2770, 2781; *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 339-40, 41 L. Ed. 2d 789, 805, 94 S. Ct. 2997, 3007.) The free flow of ideas and opinions imperative to our

system of government demands strict adherence to this principle. Therefore, a defamatory expression of an idea or opinion is not actionable. However, if an expressed opinion or idea is, in effect, partly factual, in that it implies undisclosed defamatory facts as its basis, then it may be actionable. See Restatement (Second) of Torts sec. 566 (1977); W. Keeton, Prosser & Keeton on Torts sec. 113 (5th ed. 1984).

■ Here, it is clear that the ideas and opinions in the editorial do not imply undisclosed defamatory facts as their bases. To the extent that the editorial makes disclosed factual statements, the statements are privileged for the same reason that the statements in the newspaper articles are privileged; they are a fair abridgment of governmental and public proceedings that deal with matters of public concern.

Plaintiff relies mainly upon *Brown & Williamson Tobacco Corp. v. Jacobson* (7th Cir. 1983), 713 F.2d 262, to support his argument that the newspaper articles and the editorial are not privileged and are not a fair abridgment of the governmental and public proceedings. However, we are neither bound (*City of Chicago v. Groffman* (1977), 68 Ill. 2d 112, 118-19, 368 N.E.2d 891, 894; *Sorenson v. Fio Rito* (1980), 90 Ill. App. 3d 368, 373-74, 413 N.E.2d 47, 52) nor persuaded by the opinion in *Brown & Williamson Tobacco Corp.* We decline to follow the *Brown & Williamson Tobacco Corp.* opinion.

■ Plaintiff's next argument relates to discovery and the law applicable to motions to dismiss. Defendants filed motions to dismiss pursuant to section 2—619 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—619). Defendants alleged in their motions that the newspaper articles are substantially true accounts of plaintiff's indictment and therefore nonactionable, that the newspaper articles are substantially true accounts of governmental and public proceedings and therefore privileged, and that the newspaper articles are not libelous and therefore nonactionable. In support of their motions, defendants filed: (1) a copy of the U.S. Department of Justice Information Release of October 13, 1981; (2) the affidavit of the police sergeant from the Chicago Police Department OCD stating the information that he gave to the news media on October 13, 1981; and (3) a copy of the Federal grand jury charges showing the six-count indictment against plaintiff.

Plaintiff sought discovery before responding to the motions to dismiss, but in the trial court, he "agreed that additional discovery beyond that which defendants voluntarily submitted was not necessary to respond to *** whether the publications and/or broadcasts were substantially true and whether the inaccuracies in the news reports were not libelous in any event." In view of plaintiff's satisfaction that no

further discovery was needed to decide these broad issues, plaintiff's contention that he needed additional discovery to respond to the narrow issue of whether the newspaper articles are privileged is unavailing. A decision as to whether the newspaper articles are privileged involves no more than the application of the law to the same discoverable facts that would be necessary to decide "whether the publications and/or broadcasts were substantially true and whether the inaccuracies in the news reports were not libelous in any event." Plaintiff's position is therefore without merit.

■ Plaintiff next states that "affidavits under section 2—619 cannot be used to establish factual defenses, only affirmative defenses, as a matter of law," and that "under a section 2—619 motion to dismiss all well pled facts within the complaint must be taken as true." From these principles, plaintiff postulates "that the defendants were not entitled to prevail on their privilege arguments on a motion to dismiss." We disagree.

Section 2—619 provides that a defendant may, within the time for pleading, file a motion for dismissal of the action upon any of nine stated grounds, and if the grounds do not appear on the face of the pleading attacked, the motion shall be supported by affidavit. The last of the stated grounds under section 2—619 is that "the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim." In applying this stated ground to defamation cases, it has been consistently held that the issue of a privilege is an affirmative defense, and it may be raised by and determined upon a motion to dismiss under this section. See *Kilbane v. Sabonjian* (1976), 38 Ill. App. 3d 172, 175, 347 N.E.2d 757, 760-61. Compare *Edwards v. University of Chicago Hospitals & Clinics* (1985), 137 Ill. App. 3d 485, 489, 484 N.E.2d 1100, 1104, and *Newell v. Field Enterprises, Inc.* (1980), 91 Ill. App. 3d 735, 749, 415 N.E.2d 434, 446.

It follows that defendants' documents and affidavit in support of their motions to dismiss are being used not to establish a factual defense, but rather, to establish the existence of an affirmative defense as a matter of law. It also follows that establishment of the affirmative defense of privilege defeats the alleged cause of action even though the well-pleaded facts in the complaint are admitted for the purpose of defendants' motions to dismiss. We therefore conclude that plaintiff's contention that defendants were not entitled to prevail on their privilege arguments on a motion to dismiss is untenable.

■ With respect to defendants CBS and Jacobson, the complaint does not quote or state specific statements that were made by Jacobson in his televised newscasts. Rather, the complaint merely states the

conclusion "[t]hat the report contained false, malicious and defamatory libels of and concerning the plaintiff." While notice pleading prevails under the Federal rules (*Conley v. Gibson* (1957), 355 U.S. 41, 45-47, 2 L. Ed. 2d 80, 84-85, 78 S. Ct. 99, 101-03; Fed. R. Civ. P. 8(a)(2)), a civil complaint in Illinois is required to plead the ultimate facts which give rise to the cause of action. We are concerned here only with the specificity of the allegations. The allegations are sufficiently specific if they factually set forth the elements necessary to state a cause of action. (*People ex rel. Scott v. College Hills Corp.* (1982), 91 Ill. 2d 138, 145, 435 N.E.2d 463, 467.) It is obvious that the elements of a cause of action for libel are not factually set forth unless the defamatory words of the defendant are included. Thus, it has long been the rule that in an action for libel, the words alleged to be defamatory must be set forth clearly and with particularity. (*Wilson v. Hunk* (1977), 51 Ill. App. 3d 1030, 1035, 367 N.E.2d 478, 482; *American Pet Motels, Inc. v. Chicago Veterinary Medical Association* (1982), 106 Ill. App. 3d 626, 632, 435 N.E.2d 1297, 1302; *American International Hospital v. Chicago Tribune Co.* (1985), 136 Ill. App. 3d 1019, 1020, 483 N.E.2d 965, 968.) In *Brown v. Glickstein* (1952), 347 Ill. App. 486, 491, 107 N.E.2d 267, 269, the court held that an allegation that defendants "did make divers false, malicious and scandalous statements of and concerning the plaintiff" is "a mere conclusion and does not set forth slanderous or libelous words with required particularity." We therefore believe that in order to sufficiently allege a libel action, the particular words that are defamatory must either be pleaded in the complaint or appear in an exhibit that is part of the complaint. Thus, with respect to defendants CBS and Jacobson, we conclude that the complaint is fatally defective.

■■ Plaintiff states: "If any such defect exists, obviously it can be cured by amendment if the case is remanded. Given the trial court's ruling, it would have been futile to make such an amendment previously." We disagree. The record clearly demonstrates that defendants furnished plaintiff's attorneys a tape of Jacobson's televised newscasts long before the motions to dismiss were heard or ruled upon. It is the responsibility of the plaintiff to ensure that the complaint sufficiently states a cause of action, and if it does not, to file an amendment at the earliest opportunity. A plaintiff cannot cavalierly assume that he will be given leave to file an amendment to properly state a cause of action for the first time at his own whim. Since plaintiff did not know what the trial court's ruling on the motions to dismiss would be before the ruling was announced, it would not have been futile "to make such an amendment previously."

Accordingly, we affirm the dismissal of plaintiff's libel action against all defendants.

Affirmed.

WHITE, J., concurs.

JUSTICE McNAMARA, specially concurring:
I agree with the majority decision to affirm the trial court's order granting defendants' motion to dismiss, but I differ with the majority as to the basis of that decision. Defendants raised the defense of substantial truth, and the privilege that protects fair and accurate summaries of government proceedings. I have concluded that the trial court properly relied on defendants' showing that the statements were substantially true, and properly decided not to reach the issue of privilege. I disagree with the majority's analysis which disregards the defense of substantial truth and instead addresses the privilege defense. I also disagree with the majority's analysis of the scope of the privilege defense.

It has long been recognized that truth is a defense to a defamation action and that literal truth need not be established. (*Altman v. Amoco Oil Co.* (1980), 85 Ill. App. 3d 104, 406 N.E.2d 142; *Kilbane v. Sabonjian* (1976), 38 Ill. App. 3d 172, 347 N.E.2d 757; *Mitchell v. Peoria Journal-Star, Inc.* (1966), 76 Ill. App. 2d 154, 221 N.E.2d 516.) A showing of the truth of the "gist or sting" of the defamatory imputation is sufficient. (*Kilbane v. Sabonjian* (1976), 38 Ill. App. 3d 172, 347 N.E.2d 757; *Mitchell v. Peoria Journal-Star, Inc.* (1966), 76 Ill. App. 2d 154, 221 N.E.2d 516.) In the present case, the gist or sting of the defamatory imputation contained in the news reports is that plaintiff was indicted for distributing illegal drugs after being one of many targets under investigation in a major government operation.

Plaintiff contends that the news reports are false in that they link him to the gang members who were indicted for unlawful delivery of Talwin, while plaintiff's indictment contains no such link. The news reports, however, are not based solely on the strict language of plaintiff's indictment. They report information disseminated from the office of the United States Attorney through an information release, and from Sergeant Terrence J. McCue of the Chicago police department. The information release states that plaintiff was charged with distributing a controlled substance, phendimetrazine, outside of the course of his professional practice. The information release goes on to place plaintiff's indictment into the context of the entire operation: "[T]hese

Federal charges are the result of a lengthy coordinated investigation by federal and local law enforcement authorities aimed at the illegal distribution of Talwin (a heroin substitute) and other abuse controlled substances. [The United States Attorney] indicated that these types of controlled prescription drugs are sold by 'pill pushers' in Chicago's neighborhoods, and his office is going to vigorously prosecute the medical providers, such as pharmacists and doctors, who are the initial sources of such drugs in the distribution chain." Sergeant McCue's affidavit accompanying defendants' motions to dismiss also placed plaintiff's indictment in the context of the massive investigation. It mentioned that many of those indicted were members of the El Rukn street gang and that one of the doctors indicted was plaintiff.

The link between plaintiff's indictment for distributing one drug and the gang members' indictments for delivering another drug, then, came from the government officials announcing the indictments. The reports accurately characterized plaintiff as one target in an investigation of massive proportions involving the illegal distribution of drugs by doctors, pharmacists and gang members. That is the real gist or sting of the articles. The news reports' mischaracterization of plaintiff as a supplier of controlled substances to the gang members is nothing more than sloppy reporting on the part of the reporters. It does not amplify the real gist or sting of the statements. The government officials linked the doctors and pharmacists with the street gang in their releases, and the press truthfully and accurately reported this link. Thus, the trial court properly granted defendants' motion to dismiss because the news reports were truthful and truth is a defense to a defamation action.

Notwithstanding my conclusion that the majority unnecessarily relied on the privilege defense in affirming the trial court, I find that the majority distorts the law relating to that privilege. The relevant privilege is stated in the Restatement (Second) of Torts sec. 611 (1977): "The publication of defamatory matter concerning another in a report of an official action or proceeding or a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported." Illinois recognizes this privilege. *Catalano v. Pechous* (1980), 83 Ill. 2d 146, 419 N.E.2d 350, *cert. denied* (1981), 451 U.S. 911, 68 L. Ed. 2d 300, 101 S. Ct. 1981; *Lulay v. Peoria Journal-Star, Inc.* (1966), 34 Ill. 2d 112, 214 N.E.2d 746.

In order to bolster its conclusion that the issue of falsity is irrelevant here, the majority states that "the privilege exists even though the publisher does not believe that the defamatory statements from

the proceedings are true and even though the publisher knows that they are false." In support of this broad statement, the majority cites two authorities, comment a to sec. 611 of the Restatement (Second) of Torts (1977), and sec. 115 of Prosser & Keeton on Torts (5th ed. 1984). The majority misconstrues the law as stated in these two authorities, and fails to recognize other pertinent law.

Comment a to section 611 does state that "the privilege exists even though the publisher himself does not believe the defamatory words he reports to be true and even when he knows them to be false." Our supreme court, however, has expressly refused to indicate approval of the "neutral reporting" doctrine, which provides "that a newspaper, under some circumstances, is protected against liability in reporting a defamatory statement about a public official or public figure even if the newspaper knew that the statement was false." (*Catalano v. Pechous* (1980), 83 Ill. 2d 146, 170, 419 N.E.2d 350, 361.) In the face of this language from our supreme court, I do not believe that we should adopt the rule stated in comment a to section 611.

Furthermore, the Restatement does not stop at comment a. In comment b, it goes on to explain that the language in comment a has been significantly limited by holdings of the Supreme Court. "The privilege stated in this Section permits a person to publish a report of an official action or proceeding *** even though the report contains what he knows to be a false and defamatory statement. The constitutional requirement of fault is met in this situation by a showing of fault in failing to do what is reasonably necessary to insure that the report is accurate and complete or a fair abridgement." (Restatement (Second) of Torts sec. 611, comment b (1977).) Thus, the Restatement recognizes that the privilege to publish a false and defamatory statement made by a government official is only protected when both the common law privilege's element of fairness and the constitutional privilege's element of fault are met.

The element of fairness which permeates the common law privilege for summaries of governmental proceedings is also seen in comment f to section 611: "Not only must the report be accurate, but it must be fair." The report should not be written in such a way that "conveys an erroneous impression." For example, whether the "report of one side of a trial is not as complete as that of the other side is a factor to be considered in determining whether the report, as a whole, is unfair." (Restatement (Second) of Torts sec. 611, comment f (1977).) The majority's statement, permitting the publication of false defamatory statements without any qualification, ignores this fundamental element of fairness.

The element of fault and underlying concern for truth extends throughout the law relating to the constitutional privilege for summaries of governmental proceedings. In considering these constitutional mandates in connection with section 611 of the Restatement, Prosser & Keeton on Torts states:

> "In the *Second Restatement of Torts* [sec. 611], the position has been taken that malice in the sense of an improper motive or purpose in publishing a fair and accurate report of public proceedings containing a defamatory statement about the plaintiff will not constitute an abuse of the privilege or constitute the kind of fault that will justify the imposition of liability on the defendant, even when the publisher believed the defamatory statement made about the plaintiff to be false. But there is substantial judicial authority to the contrary, and the result does not appear to be constitutionally mandated." W. Keeton, *Prosser & Keeton on Torts* sec. 115, at 838 (5th ed. 1984).

The Supreme Court has indicated its concern with publishers' knowledge of falsehood on numerous occasions. In *Time, Inc. v. Pape* (1971), 401 U.S. 279, 28 L. Ed. 2d 45, 91 S. Ct. 633, the court states that "a constitutional zone of protection [exists] for errors of fact caused by negligence. The publisher who maintains a standard of care such as to avoid knowing falsehood or reckless disregard of the truth is thereby given assurance that those errors that nonetheless occur will not lay him open to an indeterminable financial liability." (401 U.S. 279, 291, 28 L. Ed. 2d 45, 54, 91 S. Ct. 633, 640.) While the court in *Time, Inc. v. Pape* recognized the first amendment's need for "breathing space," and the need to tolerate some error, it added a final cautionary note: " 'Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation.' " (*Time, Inc. v. Pape* (1971), 401 U.S. 279, 292, 28 L. Ed. 2d 45, 55, 91 S. Ct. 633, 640, quoting *St. Amant v. Thompson* (1968), 390 U.S. 727, 732, 20 L. Ed. 2d 262, 267, 88 S. Ct. 1323, 1326.) The court in *St. Amant* also stated that: "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." (*St. Amant v. Thompson* (1968), 390 U.S. 727, 731, 20 L. Ed. 2d 262, 267, 88 S. Ct. 1323, 1325.) This reasoning was emphasized in another case: "[T]here is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in "uninhibited, robust, and wide-open' debate on public issues." *Gertz v. Robert Welch, Inc.* (1974), 418 U.S.

323, 340, 41 L. Ed. 2d 789, 805, 94 S. Ct. 2997, 3007, quoting *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 270, 11 L. Ed. 2d 686, 701, 84 S. Ct. 710, 721.

I recognize that these Supreme Court cases were not construing language such as the broad statements in comment to section 611 and in the majority opinion in the present case. However, those broad statements permit the publication of a defamatory statement which the publisher knows is false, and I find the Supreme Court's underlying concern for avoiding an abuse of the applicable privilege of utmost importance and relevance here.

Furthermore, I disagree with the majority's rejection, without discussion or any attempt to distinguish, *Brown & Williamson Tobacco Corp. v. Jacobson* (7th Cir. 1983), 713 F.2d 262. The majority states that it declines to follow that case, which it says plaintiff relies mainly upon "to support his argument that the newspaper articles and the editorial are not privileged and are not a fair abridgement of the governmental and public proceedings." Plaintiff does not, however, rely on the case as support for its argument against privilege. Plaintiff relies on *Brown & Williamson Tobacco Corp.* only as support for his argument that the news reports were not substantially true and were libelous *per se*. Moreover, the language in that case regarding the publishing of defamatory statements known to be false is *dicta*, and it is doubtful that plaintiff would rely on it. The court there reviewed the Illinois cases which discuss whether the privilege to republish government reports is forfeited by proof of actual malice, but declined to decide the issue, concluding that the issue would become moot if the jury, on remand, found the news report was not a fair summary. Thus, plaintiff does not rely on this *dicta*, and the majority unnecessarily rejects it. Additionally, I find nothing objectionable in the applicable language in that case. See *Brown & Williamson Tobacco Co. v. Jacobson* (7th Cir. 1983), 713 F.2d 262, 272-73.

In sum, I disagree with the breadth of the majority's statements permitting the publication of defamatory statements known to be false. The issue need not have been addressed. Moreover, such a broad statement endangers the constitutional principles set forth by the Supreme Court, misconstrues the law cited by the majority, and ignores our supreme court's refusal to adopt such a policy.

I adopt the majority's rationale regarding the discovery and procedural issues. I also conclude that the trial court properly found that the statements were substantially true and correctly granted defendants' motion to dismiss plaintiff's complaint.

APPENDIX

CHICAGO SUN-TIMES, October 14, 1981

# Drug raiders seize 26 here, charge 2 doctors

Chicago police Tuesday arrested 26 of 84 suspected drug pushers as federal authorities charged two doctors and two pharmacists with supplying drugs to the El Rukn street gang.

The crackdown, which authorities billed as the most coordinated investigation in city history, crippled, at least temporarily, gang-controlled narcotics traffic in the black community on the South and West sides.

One of the pharmacists was charged with possession with intent to distribute 600,000 Talwin tablets with a street value of $3 million. Talwin, when mixed with the blue-colored amphetamine pyribenzamine, is known as a heroin substitute, "T's and Blues."

AT LEAST 71 of the 84 people named in the 117 suppressed indictments returned last week in Cook County are members or associates of the El Rukns, led by Jeff Fort, police said.

\* \* \* \* \*

In announcing the federal charges, acting U.S. Attorney Dan K. Webb praised the federal-city effort and promised his office would "vigorously prosecute the medical providers, such as pharmacists and doctors, who are the initial sources of such drugs in the distribution chain."

Those charged with federal crimes were identified as:

● Dr. Frank R. Swiatek, 76, of 70 N. Harbert, Riverside Swiatek was indicted on seven counts of distributing phendimetrazine, a stimulant, without prescriptions.

● Dr. James G. O'Donnell, 35, of 3256 S. Lowe. O'Donnell was indicted on six counts of distributing drugs without prescriptions. The offices of Swiatek and O'Donnell are at 2209 W. Cermak.

● Joseph Williams, 50, of 7719 S. Paxton. Williams, a pharmacist at Odie Pharmacy, 5822 W. Division, was indicted on five counts of illegal possession with intent to distribute more than 10,000 Talwin tablets and five counts of failing to keep accurate records.

● Tyree Simmons, 46, of 10542 S. King. Simmons, a pharmacist at Supreme Drugs, 3507 S. King, was charged with 26 counts of possession with intent to distribute 600,000 Talwin tablets and three counts of failing to keep accurate records.

APPENDIX

CHICAGO TRIBUNE, October 14, 1981

# 26 arrested, doctors indicted in bust of El Rukn drug ring

By Lynn Emmerman
and Thomas Powers

POLICE AND federal agents Tuesday, arrested 26 persons who are among 71 named in suppressed indictments issued by a Cook County grand jury, in the culmination of a six-month investigation into the distribution of synthetic herein in the city.

Federal grand jury indictments also have been returned against two doctors in connection with distribution of a "speed" derivative and four pharmacists accused of dealing in "T's" and "blues." Talwin and pyrabenzamine, which in combination act like heroin.

The operation was controlled largely by the El Rukns street gang, investigators said. After Tuesday's arrests, a jubilant federal agent said, "The El Rukns' hold on Chicago is over."

THOSE INVESTIGATED and indicted ranged from the physicians and druggists to the El Rukns, who allegedly sold the drugs to street dealers and directly to users. The doctors' and pharmacists' alleged roles in the operation were to buy from suppliers.

Agencies taking part in the investigation included the United States Drug Enforcement Administration; the Chicago Police Department; the U.S. attorney's office; and the Cook County state's attorney's office.

In the six-month period, officers spent $26,000 posing as "users," making undercover buys of the drugs at various South Side locations.

The physicians under federal indictment are Frank R. Switek, 76, of 70 N. Hubert, Riverside, with offices at 2209 W. Cermak Rd., Chicago, charged with seven counts of illegal distribution of phendimetrazine, a speed-derivative drug; and James G. O'Donnell, 35, of 3256 S Lowe Av., also with offices at 2209 W Cermak, charged with six counts of illegal distribution of the drugs.

The pharmacists are Joseph Williams, 50, of 7719 S. Paxton Av., who has a pharmacy at 3922 W. Division St.. charged with five counts of distributing Talwin, the heroin substitute; Tyree Simmons, 46, of 10542 S. King Dr., with a pharmacy at 3507 S. King Dr., 26 counts of dealing in Talwin and other substances. and Henry Parker and Grinnell Coleman, identified as the owners of a South Side pharmacy known as A.B Medic.

* * * * *

Further raids on pharmacies are expected in the next few months in hopes of destroying crucial links in the chain of distribution of "T's" and "blues."

APPENDIX

CHICAGO TRIBUNE, October 14, 1981

# Drug ring broken; 26 seized

## 2 doctors indicted as gang's source

By Lynn Emmerman
and Thomas Powers

POLICE AND federal agents arrested 26 persons Tuesday who are among 71 named in suppressed indictments issued by a Cook County grand jury, in the culmination of a six-month investigation into the distribution of synthetic heroin in the city.

Federal grand jury indictments also have been returned against two doctors in connection with distribution of a "speed" derivative and four pharmacists accused of dealing in "T's" and "blues," Talwin and pyrabenzamine, which in combination act like heroin.

The operation was controlled largely by the El Rukns street gang, investigators said. After Tuesday's arrests, a jubilant federal agent said, "The El Rukns' hold on Chicago is over."

El Rukns leader Jeff Fort has not been implicated in the drug sales in the current sweep. But police sources said they intended to bring five "weak links" in his organization before a federal grand jury in an attempt to learn whether he played a role in the drug operation.

Fort, an ex-convict, was arrested Friday night and charged with harboring a fugitive and possession of a firearm. He was carrying $12,000, which was confiscated.

THOSE INVESTIGATED and indicted ranged from the physicians and druggists to the El Rukns, who allegedly sold the drugs to street dealers and directly to users. The doctors' and pharmacists' alleged roles in the operation were to buy from suppliers.

Agencies taking part in the investigation included the United States Drug Enforcement Administration; the Chicago Police Department; the U.S. attorney's office; and the Cook County state s attorney's office.

In the six-month period officers spent $26,000 posing as "users," making under cover buys of the drugs at various South Side locations.

The physicians under federal indictment are Frank R Switek. 76. of 70 N. Hubert. Riverside. with offices at 2209 W Cermak Rd.. Chicago. charged with seven counts of illegal distribution of phen dimetrazine. a speed-derivative drug. and James G. O'Donnell. 35. of 3256 S Lowe Av.. also with offices at 2209 W Cermak. charged with six counts of illeg al distribution of the drugs.

The pharmacists are Joseph Williams. 50. of 7719 S. Paxton Av.. who has a pharmacy at 5922 W. Division St.. charged with five counts of distributing Talwin. the heroin substitute: Tyree Simmons. 46. of 10542 S. King Dr.. with a pharmacy at 3507 S King Dr.. 26 counts of dealing in Talwin and other substances: and Henry Parker and Grinnell Coleman. identified. as the owners of a South Side pharmacy known as A.B Medic.

A total of 71 persons were named in the 128 suppressed indictments by a Cook County grand jury.

APPENDIX

CHICAGO SUN-TIMES, October 15, 1981

# S. Side dealer seized in drug sweep

**By Jim Casey and Tom Page Seibel**

Chicago police Wednesday arrested another suspected drug dealer and were seeking 47 others after the initial roundup of 30 people associated with an alleged drug ring operated by the El Rukn street gang.

The latest arrest was of George Greer, 24, of 625 E. 47th, who was charged with delivery of a controlled substance.

The 30 people arrested Tuesday by federal and local authorities when the sweep began were to be arraigned Thursday.

It was learned the roundup had to be delayed a few days because of a surprise raid by homicide detectives Friday night at a South Side apartment building occupied by El Rukn members.

In that raid, detectives arrested a murder fugitive and members of El Rukn, including gang leader Jeff Fort.

Fort was indicted Wednesday on a charge of harboring a fugitive. He has not been implicated in the current drug investigation, authorities said.

The crackdown, which authorities billed as the most coordinated investigation in city history, crippled, at least temporarily, gang-controlled narcotics traffic in the black community on the South and West sides.

Gang Crimes Cmdr. Edward Pleines said the mass arrests probably won't put an end to drug dealing by the El Rukns, "but it should slow it up for a while," he said.

Among those arrested were two doctors and two pharmacists accused of supplying the drugs to the street gang.

One of the pharmacists was charged with possession with intent to distribute 600,000 Talwin tablets with a street value of $3 million. Talwin, when mixed with the blue-colored amphetamine pyribenzamine, is known as a heroin substitute, "T's and blues."

● Fort indicted for hiding fugitive; Page 12.
● A cheer for crackdown on 'T's and blues'; an editorial, Page 61.

At least 71 named in the 117 suppressed indictments returned last week in Cook County are members or associates of the El Rukns, police said.

Several of those indicted are gang "generals," police said, including St. Anthony Fox, of 207 E. 47th St. Police said Fox was carrying $1,940 when arrested by teams of law enforcement officers at a warehouse at 40th and Calumet.

In announcing the federal charges, acting U.S. Attorney Dan K. Webb praised the federal-city effort and promised his office would "vigorously prosecute the medical providers, such as pharmacists and doctors, who are the initial sources of such drugs in the distribution chain."

Those charged with federal crimes were identified as:

● Dr. Frank R. Swiatek, 76, of 70 N. Herbert, Riverside. Swiatek was indicted on seven counts of distributing phendimetrazine, a stimulant, without prescriptions.

● Dr. James G. O'Donnell, 35, of 3256 S. Lowe. O'Donnell was indicted on six counts of distributing drugs without prescriptions. The offices of Swiatek and O'Donnell are at 2200 W. Cermak.

● Joseph Williams, 50, of 7719 S. Paxton. Williams, a pharmacist at Odie Pharmacy, 5922 W. Division, was indicted on five counts of illegal possession with intent to distribute more than 10,000 Talwin tablets and five counts of failing to keep accurate records.

● Tyree Simmons, 46, of 10542 S. King. Simmons, a pharmacist at Supreme Drugs, 1507 S. King, was charged with 26 counts of possession with intent to distribute 600,000 Talwin tablets and three counts of failing to keep accurate records.

APPENDIX

CHICAGO SUN-TIMES, October 15, 1981

# 48 dealers hunted in drug sweep

By Jim Casey and Tom Page Seibel

Chicago police Wednesday were searching for 48 suspected drug dealers, after city and federal authorities rounded up 30 people associated with an alleged drug ring operated by the El Rukn street gang.

Those arrested Monday when the sweep began were to be arraigned Thursday.

It was learned the roundup had to be delayed a few days because of a surprise raid by homicide detectives Friday night at a South Side apartment building occupied by El Rukn members.

In that raid, detectives arrested a murder fugitive and members of El Rukn, including gang leader Jeff Fort.

Fort was to appear in court Wednesday on charges of unlawful possession of a firearm and concealing a fugitive. He has not been implicated in the current drug investigation, authorities said.

The crackdown, which authorities billed as the most coordinated investigation in city history, crippled, at least temporarily, gang-controlled narcotics traffic in the black community on the South and West sides.

Gang Crimes Cmdr. Edward Pleines said the mass arrests probably won't put an end to drug dealing by the El Rukns, "but it should slow it up for a while," he said.

Among those arrested were two doctors and two pharmacists accused of supplying the

• A cheer for crackdown on 'T's and blues'; an editorial, Page 81.

drugs to the street gang.

One of the pharmacists was charged with possession with intent to distribute 600,000 Talwin tablets with a street value of $3 million. Talwin, when mixed with the blue-colored amphetamine pyribenzamine, is known as a heroin substitute, "T's and blues."

At least 71 named in the 117 suppressed indictments returned last week in Cook County are members or associates of the El Rukns, police said.

Several of those indicted are gang "generals," police said, including St. Anthony Fox, of 207 E. 47th St. Police said Fox was carrying $1,940 when arrested by teams of law enforcement officers at a warehouse at 40th and Calumet.

In announcing the federal charges, acting U.S. Attorney Dan K. Webb praised the federal-city effort and promised his office would "vigorously prosecute the medical providers, such as pharmacists and doctors, who are the initial sources of such drugs in the distribution chain."

Those charged with federal crimes were identified as:

• Dr. Frank R. Swiatek, 76, of 70 N. Herbert, Riverside. Swiatek was indicted on seven counts of distributing phendimetrazine, a stimulant, without prescriptions.

• Dr. James G. O'Donnell, 35, of 3256 S. Lowe. O'Donnell was indicted on six counts of distributing drugs without prescriptions. The offices of Swiatek and O'Donnell are at 2209 W. Cermak.

• Joseph Williams, 50, of 7719 S. Paxton

APPENDIX

CHICAGO SUN-TIMES, October 15, 1981        EDITORIAL

# A cheer for T's-and-blues crackdown

One sigh of relief: finally, a coordinated sweep against the drug trade that has been so profitable to the brutal El Rukn street gang.

The dozens of arrests this week (after a six-month investigation by federal, county and city officials) are good news for citizens who have seen the gang grow powerful, rich and deadly by preying on the addiction of others on the South and West sides.

Several indictments among the 117 returned in the case show one especially ugly aspect of the drug problem.

A few physicians and pharmacists were high on the list of those arrested. The pharmacists' specialty appears to have been distributing Talwin, a painkiller that is mixed with an antihistamine to become T's and blues, a street substitute for heroin.

Among them, the pharmacists were charged with intent to distribute more than half a million Talwin tablets.

They and the physicians indicted with them have all taken oaths to help save lives, not harm them. We hope the law reserves its utmost scorn—and strongest penalties—for professionals ultimately convicted of helping the El Rukns maintain their drug stranglehold on so many Chicago neighborhoods.

That's one reason we're heartened by the promise of acting U.S. Attorney Dan K. Webb to "vigorously prosecute the medical providers, such as pharmacists and doctors, who are the initial sources of [illicit] drugs in the distribution chain."

We're also gratified that investigators zeroed in on Talwin—a drug mentioned first on these pages 3½ years ago, when its abuse began showing up in coroners' records as a significant cause of death in Cook County.

It has taken all this time, but at long last there is well-planned action against the worst of the T's-and-blues exploiters in Chicago.

CHICAGO TRIBUNE, October 15, 1981

# Calm follows South Side drug sweep

By Lynn Emmerman

THE SOUTH SIDE was unusually quiet Wednesday. The drug addicts who haunt Calumet and Indiana avenues had vanished. Their suppliers were hiding or in jail.

For the first time in more than a year, elderly residents, mothers, and children strolled down those streets without fear. They smiled tentatively at policemen who were searching the area, armed with arrest warrants for more dealers.

"It's like a miracle," one silver-haired woman told a patrolman. "It looks like you finally got the El Rukn street gang out of this neighborhood for good."

IN AN UNPRECEDENTED cooperative effort a day earlier, policemen and federal agents swooped down on South Side traffickers of "T's and Blues," or Talwin and pyrabenzamine. When combined and injected, the drugs duplicate the effects of heroin. According to police, the Midwestern T's and Blues market is controlled by the El Rukns, who are based on the South Side.

Those arrested on charges of distributing the drugs were among 71 people named in suppressed indictments handed down by a Cook County grand jury. Twenty-eight people were in the custody of narcotics officers Wednesday. Police officials said the arrests would continue.

Federal grand jury indictments also have been returned against four South Side pharmacists and two physicians. They are accused of supplying gang dealers with the drugs.

*  *  *  *  *

Meanwhile, federal drug diversion agents worked with Winthrop Laboratories of New York City, which manufactures Talwin, to pinpoint pharmacists and doctors purchasing suspiciously large amounts of the drug.

"We found that pharmacists were having cartons of Talwin shipped to them. The druggists took the cartons in the front door and sold them to El Rukn suppliers out the back door. Then they destroyed their records of the purchase," said William Olivanti, Midwestern regional director of the DEA.