**Earle MOLONEY and Moloney Manufacturing Corporation, Plaintiffs and Counterdefendants,**

v.

**James CENTNER and Moloney Coachbuilders, Inc., Defendants and Counterplaintiffs.**

**No. 88 C 6564.**

United States District Court, N.D. Illinois, E.D.

Dec. 27, 1989.

Mark Devane, McKenna Storer Rowe White & Farrug, Chicago, Ill., for plaintiffs and counterdefendants.

Michael R. Levinson, Seyfarth Shaw Fairweather & Geraldson, Kenneth E. Kraus, Steven A. Weiss, Schopf & Weiss, Chicago, Ill., for defendants and counterplaintiffs.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

The plaintiffs Earle Moloney and Moloney Manufacturing Corp. filed this multi-count action charging the defendants James Centner and Moloney Coachbuilders, Inc. with violations of § 43 of the Lanham Trademark Act, 15 U.S.C. § 1125, the Illinois Deceptive Trade Practices Act, Ill.Rev. Stat. ch. 121½, § 311 *et seq.*, the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121½, ¶ 261 *et seq.* and various common law duties. The defendants have moved for summary judgment on five of the claims and to dismiss the remaining three. For the following reasons, the motion for summary judgment is granted in part and denied in part, and the motion to dismiss is granted.

### Factual Background

Most of the plaintiffs' claims revolve around a contract ("Purchase Agreement") entered into by the parties on September 17, 1986, in which Moloney Manufacturing agreed to sell certain of its assets to Moloney Coachbuilders and its sole shareholder Jacques Moore for $1.8 million. The assets included goodwill, the names "Moloney Coach Builders" and "Federal Limousine," customer lists, advertising materials, drawings, engineering reports and various listed properties used in the manufacturing of limousines. The parties additionally agreed to the following noncompetition terms:

Seller and Moloney agree that for a period of five (5) years from the closing date, neither will directly or indirectly ... engage in the business of manufacturing limousines. As utilized herein a "limou-

sine" shall include any vehicle which has been extended in overall length in excess of 20 inches. Notwithstanding such agreement it is further agreed, by and between the parties hereto that neither Seller nor Moloney shall be prohibited from performing any other automobile customizing work or producing or selling armored vehicles including armored limousines. Automobile customizing work shall include any and all redesign of interior or exterior appearances of any automobiles which, after any such redesign or customizing work, have been extended in overall length not more than 20 inches. Armored vehicles including armored limousines are defined as all limousines to which have been added armor or other protective or deflecting materials to any degree of protection or other necessary equipment for the purposes of securing the passengers from outside intruders or destructive forces. In the production of armored vehicles including armored limousines, Seller, and Moloney shall not extend any such vehicles in excess of 20 inches notwithstanding anything heretofore provided in this paragraph.

Purchase Agreement, ¶ 7.1. An exhibit attached to the Purchase Agreement further specified Moloney's retained right to manufacture limousines extended not more than twenty inches:

> [B]oth Buyer and Moore acknowledge and agree that Seller and Moloney are retaining the right to continue the manufacture of certain automobiles which, after redesign or customizing work, have been extended in overall length not more than 20 inches, including the EM–SERIES Cadillac (an automobile currently manufactured by Seller). In addition, both Buyer and Moore acknowledge and agree that Seller and Moloney are retaining the right to continue the manufacture of armored vehicles including armored limousines which are defined as all limousines, not extended more than 20 inches to which has been added armor or other protective or deflecting materials to any degree of protection or other necessary equipment for the purposes of

securing the passengers from outside intruders or destructive forces.

Purchase Agreement, Exhibit F at 2.

In Counts III through V, plaintiffs allege that Centner misrepresented to a WGN–TV reporter that Moloney Coachbuilders, rather than Moloney Manufacturing, had been in the armored limousine business since 1969 and had manufactured armored limousines for the Premier of Turkey and the Communist Party Chairman of the People's Republic of China. On April 13, 1988, WGN broadcasted a report to that effect. In Counts VI through VII, plaintiffs contend that while they may have sold the name "Moloney Coachbuilders" to defendants, they did not sell rights to the registered trademark for "Moloney Coachbuilders" and its accompanying design script and styling.

The remaining two counts of plaintiffs' complaint arise from alleged conversations between Centner and a man named Paul Danca regarding Moloney's potential employment of Danca as vice president of sales of Moloney Manufacturing. Moloney had offered Danca the vice president position in July 1987. The parties dispute whether or not Moloney and Danca entered into an enforceable oral employment contract at that time. Knowing Centner had at one time worked for Moloney, Danca had sought out Centner for his opinion on Moloney and the position. Plaintiffs allege that in July and on later dates, Centner made the following statements: that Moloney was totally irrational, irresponsible and not to be believed; that he was incompetent to operate a successful business, particularly, the armored limousine business; and that he knew very little about the construction of armored limousines. Complaint, Count I, ¶¶ 6–7. Following his discussion with Centner, Danca turned down the job with Moloney. About one year later, however, Danca eventually did go to work for Moloney. Plaintiffs charge that these statements constituted defamation (Count 1) and tortious interference with a contractual relationship (Count II).

### Summary Judgment on Counts I through V

#### A. Defamation

■ Defendants mount two challenges to plaintiffs' defamation claims. First, defendants contend that the alleged comments by Centner were nonactionable statements of opinion. We disagree. If a statement of opinion or an idea is in effect partly factual, in that it implies defamatory facts as its basis, the statement may be actionable unless all facts supporting the opinion are disclosed. *O'Donnell v. Field Enterprises, Inc.,* 145 Ill.App.3d 1032, 96 Ill.Dec. 752, 758, 491 N.E.2d 1212, 1218 (1st Dist.1986); *Howell v. Blecharczyck,* 119 Ill. App.3d 987, 75 Ill.Dec. 500, 505, 457 N.E.2d 494, 499 (1st Dist.1983). Undoubtedly, one could interpret Centner's statements as merely his opinion of Moloney and his professional abilities.[1] However, it is likely that one could view his statements as implying undisclosed defamatory facts upon which the opinion was based. For example, Centner's purported comment that Moloney is not to be believed suggests that Moloney had lied to Centner or others on more than one occasion. We cannot ignore this possibility and accordingly cannot hold the statements nonactionable as a matter of law.

■ Defendants next contend that Centner's alleged comments are not actionable under a theory of defamation per se because they are capable of an innocent construction. Defendants rely on a series of cases in which the courts found statements such as that plaintiff was a lousy agent, a liar, dishonorable or deluded as nonactionable because they could not reasonably be considered to have posed a serious threat to the plaintiff's reputation. *Byars v. Kolodziej,* 48 Ill.App.3d 1015, 6 Ill.Dec. 814, 363 N.E.2d 628 (4th Dist.1977); *Valentine v. North American Co.,* 16 Ill.App.3d 277, 305 N.E.2d 746, *aff'd.,* 60 Ill.2d 168, 328 N.E.2d 265 (1974); *Delis v. Sepsis,* 9 Ill. App.3d 217, 292 N.E.2d 138 (1st Dist.1972); *Wade v. Sterling Gazette Co.,* 56 Ill.App.2d 101, 205 N.E.2d 44 (3d Dist.1965). It appears that the courts' analyses in those decisions hinged on whether the statements in the context made could be construed as branding the plaintiff a liar in general terms or that the plaintiff is unworthy of belief in any circumstance. Here, the context appears materially different in that one could construe the allegations as statements that Moloney could not be believed under any circumstances. If so, then the decisions defendants offer may not preclude plaintiffs from proceeding under a theory of defamation per se.

#### B. Tortious Interference With Contract

Plaintiffs charge that by his statements Centner intentionally caused Danca to reject employment with Moloney and thus Centner tortiously interfered with Moloney's contractual relations. Under Illinois law, the essential elements of the tort of intentional interference with contractual relations are (1) the existence of a valid and enforceable contract; (2) the defendant's knowledge of the existing contract; (3) an intentional and malicious inducement of the breach; (4) the subsequent breach by the third person due to the defendant's wrongful conduct; and (5) damage to the plaintiff. *Doyle v. Shlensky,* 120 Ill.App.3d 807, 76 Ill.Dec. 466, 458 N.E.2d 1120 (1st Dist.1983). Defendants claim that at the very least the plaintiffs have failed to establish the first two elements.

■ Although it appears that the evidence strongly supports the defendants' position regarding the first element,[2] we need

---

**1.** Danca stated in testimony that he considered Centner's statements in a telephone conversation (presumably the July 15, 1987 conversation) as opinions. Even if this is sufficient to deem those statements nonactionable, it does not account for Centner's statements made after that conversation as alleged in ¶ 7 of Count I.

**2.** Throughout his deposition testimony and in his statement, Danca suggests that at the perti-
nent time in July 1987 he had not accepted what he considered to be only an offer of employment that he *would* accept. *See, e.g.,* Danca Dep. at 180 ("Q: Did you tell Centner that you had accepted an offer with Moloney? A: No, I had not accepted an offer until afterwards. The second go-around [one year later] is when I accepted the offer.); at 190 (Q: How did you previously indicate you would accept the job

not decide whether a valid and enforceable contract actually existed, since the plaintiffs have clearly failed to satisfy element two. Even if there were a contract, the plaintiffs have not offered any proper evidence that Centner knew of any contract between Danca and Moloney, as opposed to merely an outstanding offer, when he made the statements. Centner affirmatively denies that he had such knowledge. The plaintiffs elicited no statement or deposition testimony from Danca to the effect that Danca informed Centner that a contract already existed. In fact, all Danca says in his statement is that he told Centner about a job *offer*. The only evidence to the contrary is very equivocal testimony by Moloney that he learned from Danca that Centner knew of the existence of the contract. Moloney Dep. at 103–05. Even if we construe the equivocal nature of Moloney's testimony in his favor, it nevertheless constitutes inadmissible hearsay because it is offered for the truth of the contents of Danca's statement and does not appear to fall within any of the hearsay exceptions. *See* Fed.R.Evid. 801, 802. Such hearsay testimony is as inadmissible on summary judgment as it would be at trial. *Colan v. Cutler–Hammer, Inc.,* 812 F.2d 357 (7th Cir.1987), *cert. denied,* 484 U.S. 820, 108 S.Ct. 79, 98 L.Ed.2d 42 (1987). Accordingly, we grant summary judgment in favor of the defendants on Count II.

## C. Unfair Competition Claims

Counts III through V hinge on the plaintiffs' allegation that the defendants told WGN–TV that they have been in the armored limousine business since 1969 and had built a 46–inch armored limousine for the Prime Minister of Turkey and two 34–inch armored limousines for Deng Xiaoping. On a television broadcast about the defendant Moloney Coachbuilders, which contained an interview with Centner, WGN showed two photographs depicting these limousines while a voice-over by a reporter stated that "Moloney has provided this armored limousine to the Prime Minister of Turkey and these to China's Premier." The plaintiffs contend that the alleged statements and unauthorized use of the photos violated the Purchase Agreement. The plaintiffs maintain that under the Agreement they, and not the defendants, remained the entity that has been in business since 1969, and that they alone may continue to claim that they built the armored limousines for the foreign leaders. Complaint, Counts III–V, ¶¶ 5 & 6. Thus, the plaintiffs argue that the acts and statements of the defendants were an attempt to confuse customers about the histories of Moloney Manufacturing Corporation and Moloney Coachbuilders and constituted unfair and deceptive competition with the plaintiffs. The plaintiffs' claims fail for two reasons.

██ First, the plaintiffs have offered no evidence, and Centner denies, that any defendant ever claimed to have armored or produced the limousines at issue. WGN in its report may have suggested it, but there is no evidence that the allegedly deceptive information making up the challenged portion of the report was the product of false statements made by the defendants, and there is no evidence indicating the source of the photographs used in the report. Further, the plaintiffs' attempt to chal-

from Moloney Mfg.? A: I said to him that I would think about it, and more likely I will take the job, but I would need some time to, you know, kiss off Hanley Dawson, give them a week's notice, or whatever."); Danca Statement at 1 ("Mr. Moloney offered me a position with his company ... I told Mr. Centner about my job offer ..."); at 2 ("I rejected the job that I had previously indicated I would accept ..."). Further, certain material terms, such as compensation, had not yet been agreed upon. Moloney Dep. at 64.

Plaintiffs, however, point to an isolated statement by Danca that he had verbally accepted the offer from Moloney. Danca Dep. at 190 ("Q: So in your mind, you hadn't accepted the offer? A: Well, I had verbally accepted the offer ..."). Unfortunately, the statement is cut-off, and the plaintiffs did not provide the remainder of that deposition response. Nevertheless, that statement occurred just after Danca had testified that he told Moloney that he "would like to think about [the job], and more than likely" would take the job. Considering Danca's testimony in its entirety, it is highly unlikely that any favorable inference may be drawn from it that a valid and enforceable contract actually existed.

lenge Centner's credibility is inappropriate in opposing summary judgment. They must present evidence to contradict Centner. The plaintiff's contend that a trier of fact may be able to infer from the WGN report, along with Centner's interview with WGN's reporter, that Centner did in fact state or imply that his company manufactured those or similar limousines and that it was Centner who provided the photos to WGN: "WGN Television did not get its information in a vacuum—it must have come from defendants." Plaintiffs' Memorandum at 13. We believe that, without more, such an inference is too tenuous to defeat summary judgment.

■ Second, even assuming the report directly quoted Centner as claiming that Moloney Coachbuilders had a corporate history going back to 1969 and had manufactured the limousines, the defendants purchased the right to make that claim under the Purchase Agreement. Therefore, there was no misrepresentation and no confusion regarding the defendants' capabilities for manufacturing armored limousines that have been extended 20 inches or more.

The two provisions of the Agreement quoted above apply—the noncompetition provisions in ¶ 7.1 and Exhibit F to the Agreement. Also applicable is ¶ 1.1 which provides for the purchase of specific assets, including the goodwill of the plaintiffs' company.

The plaintiffs point out that although they agreed that they would not compete with the defendants by manufacturing limousines from cars that had been extended greater than 20 inches, the Agreement does not prevent them from armoring any vehicle of any size, including limousines manufactured in excess of 20 inches by someone else. They further note that the sale did not include any of the machinery that was instrumental in producing armored vehicles of any type. Moloney Dep. at 119. The plaintiffs rely on these facts to argue that the sale to the defendants did not include the right to claim a corporate history going back to 1969 and to take

credit for having built the armored limousines. The essence of the plaintiffs' argument is that, since under the Purchase Agreement they sold only that portion of their business relating to the manufacture of limousines, they did not sell any of the business having to do with the process of armoring vehicles. And although the plaintiffs concede that nothing in the Agreement prevents the defendants from armoring cars of any size, in direct competition with the plaintiffs, the plaintiffs maintain that they alone retained the right to take credit for the established history of manufacturing armored limousines.

At the very least, the plaintiffs have overstated their case. Even assuming that the plaintiffs retained the right to claim a corporate history of armoring vehicles of any size by holding on to the business and assets relating to providing that service, they clearly gave up the right to claim a corporate history of manufacturing limousines, whether armored or not, that had been extended greater than 20 inches. By the plaintiffs' own logic, because the defendants purchased all of the business having to do with manufacturing limousines extended in excess of twenty inches, the defendants therefore purchased the exclusive right under the Agreement to take credit for having manufactured the limousines for the foreign leaders, since it is undisputed that those limousines were extended greater than 20 inches. Thus, according to the plaintiffs' analysis, the defendants would only be liable for misrepresenting a history of armoring, not manufacturing, limousines.

Nevertheless, the plaintiffs' analysis completely falls short because it fails to take into account the fact that, under ¶ 1.1, in addition to selling various assets used in the manufacturing of limousines, the plaintiffs sold the goodwill of their former business—the business of manufacturing *and* armoring limousines.[3] The sale of goodwill by definition includes the right to rely on the established reputation and history of a business. Indeed, Moloney testified that

---

**3.** There is no evidence that, prior to the sale, Moloney Manufacturing Company operated its

limousine manufacturing operation as an entity separate from its business of armoring vehicles.

Belmont Coach Builders is permanently set in the business. They have a pretty good arena of customers that are going to come to them just through what we built. That is what Moore bought. He is going to have walk-ins for—he could go on momentum for a few years, as he has done.

Moloney Dep. at 182.

In line with their argument above, the plaintiffs assert that the sale of goodwill was limited under the Agreement only to that portion of the business relating to the manufacture of limousines. The Agreement, however, makes no such limitation. In fact, the provisions of the Agreement that specify the assets to be sold, fairly clearly indicate that no such limitation was even intended. Paragraph 1.1 of the Purchase Agreement provides that:

Subject to the terms and conditions hereof, Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller, certain assets of the Business as a going concern as specified in this agreement free from all liabilities and encumbrances. The assets of the business shall include all of the various tangible properties and assets *used in the manufacturing of limousines* as more fully set forth in Exhibit A and, in addition, the following assets:

(a) Goodwill.

(b) The names "Moloney Coach Builders" and "Federal Limousine."

(c) Customer lists, rights to telephone numbers at 2640 W. Belmont, Chicago, Illinois, and directory listings, advertising material, drawings and engineering reports *relating to limousines.*

(d) Office and manufacturing expense supplies and maintenance and repair parts and components *relating to limousines.*

(f) Contracts, agreements, licenses, distributorships, or other assets of the

*limousine manufacturing business,* as set forth in Exhibit B.

All cash, bank accounts, accounts receivable, automobiles, tax refunds, the 2300 Hammond Drive, Schaumburg lease, accounts payable, investments, all liabilities (fixed, contingent, known, unknown or otherwise) and any other property not specifically included in Exhibit A or listed above are excluded from this transfer and sale.

The emphasized portions of this paragraph indicate that the parties were quite specific in expressing when the assets to be sold would be solely related to the manufacture of limousines. Significantly, subparagraph (a) sets no similar limitation on the sale of goodwill. As we have noted, the plaintiffs have conceded that they contemplated that the defendants would continue to manufacture limousines that had been extended greater than twenty inches and then armored. The only restriction was that the armoring would not be done with the plaintiffs' equipment. And that was because the plaintiffs wanted to use that equipment in what we must consider to be a new undertaking. The only conclusion that we may draw from all of this is that all of the goodwill of the plaintiffs' former business was sold to the defendants without limitation. Accordingly, the defendants had the right to represent the complete history of the predecessor business, and we grant summary judgment in their favor.[4]

### Motion to Dismiss Counts VI through VIII

Plaintiffs added three counts in the amended complaint that are grounded essentially in trademark infringement: 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a) (Count VI); Lanham Trademark Act, 15 U.S.C. § 1125(a) (Count VII); Illinois Consumer Fraud and Deceptive Business Practice Act, Ill.Rev.Stat., ch. 121½, ¶ 261 *et*

---

**4.** We might add that, leaving aside the issue whether the defendants could represent a history of armoring limousines for foreign leaders, it is evident from the Agreement that the Agreement establishes that only the defendants could claim that they presently are in the business of manufacturing armored limousines. From this standpoint, the newscast's message could not be considered confusing. If someone, who does not already own a limousine, wants to have built an armored limousine that has been extended over twenty inches, the newscast would have properly directed her to the defendants and not the plaintiffs.

*seq.* and the *Uniform Deceptive Trade Practices Act,* Ill.Rev.Stat., ch. 121½, ¶ 311 *et seq.* Each count contains identical allegations that Moloney Coachbuilders has wrongfully used Trademark Reg. No. 1,364,362 which consists of the design styling of the name "Moloney" followed by the word "coachbuilders" and a graphic design of a carriage as depicted in the registration. The defendants contend that the plaintiffs lost all rights in their trademark on Moloney Coachbuilders when they sold that name and all company goodwill to the defendants. The plaintiffs respond that they sold only the name, not the trademark, and that since they retained certain portions of their business, it cannot be presumed that they sold all of their goodwill including the trademark. We believe the defendants have the better of the argument.

■ The Purchase Agreement provides for the sale of goodwill and does not limit it to any particular part of the business. Trademark law holds that a mark has no independent existence apart from the goodwill of the business. *Berni v. International Gourmet Restaurants of America, Inc.,* 838 F.2d 642, 646 (2d Cir.1988); *Marshak v. Green,* 746 F.2d 927, 929 (2d Cir.1984); 1 J. Gilson, *Trademark Protection and Practice* § 1.03[5] at 1–28, § 3.07 at 3–104. Since a trademark cannot be sold or assigned apart from the goodwill it symbolizes, it follows that the sale of all goodwill includes the mark or, in any event, divests the seller of any standing to sue on the mark. *See Plitt Theatres v. American National Bank and Trust,* 697 F.Supp. 1031 (N.D.Ill.1988) (ownership of trademarks passes impliedly with ownership of business with which the mark is associated, absent express provisions to the contrary). Such must be the case since, if the mark and the goodwill are separated, whether purposefully or inadvertently, the goodwill is abandoned and the underlying rights are destroyed. *Universal City Studios, Inc. v. Nintendo Co.,* 578 F.Supp. 911, 923 (S.D.N.Y.1983); *Johanna Farms, Inc. v. Citrus Bowl, Inc.,* 468 F.Supp. 866, 879 (E.D.N.Y. 1978).

Plaintiffs correctly point out that the cases to which the defendants cite for the most part involved the transfer of *all* of a company's assets, whereas here, plaintiffs did retain some portion of their business. However, it appears that the reason for the rule in those cases that the transfer of all assets includes the trademark is that along with those assets generally goes goodwill, and the trademark must follow that. Here, however, the plaintiffs sold all of their goodwill, so the reasoning applies.

Thus, this case does not present the circumstances under which other courts have determined that an owner may retain a trademark even though the existing business' assets are sold. *See, e.g., Berni,* 838 F.2d at 646. In *Berni,* the Court stated,

> in order for the owner of a mark to retain, upon the sale of the business associated with the mark, the right to resume using the mark in a new enterprise, the owner's intent to resume producing substantially the same product or service must be manifest, some portion of the goodwill of the previous business must remain with the owner, and resumption of operations must occur within a reasonable time.

*Id.* at 647 (citation omitted).

In order to defeat summary judgment under this theory, the plaintiffs would have had to plead facts that permit the inference that Earle Moloney and Moloney Manufacturing did not intend to transfer their interest in the mark to Moloney Coachbuilders, but instead intended to retain the mark as their own and to resume business under the mark producing substantially the same product or service within a reasonable time. The facts pled by the plaintiffs fail to satisfy these requisites.

Plaintiffs rely on two facts giving rise to an inference that they did not intend to give up the trademark under this theory. First, they point to the fact that the terms of the Agreement make no mention of the transfer or sale of the mark, while specifying numerous other, substantial assets which were transferred. That fact alone is insufficient since "[t]rademark rights do not exist in the abstract, to be bought and

sold as a distinct asset." *Id.* (quoting *Nintendo,* 578 F.Supp. at 922). As we have already noted, trademark law presumes that a mark follows the sale of an existing business along with its goodwill. Thus, we cannot draw an inference in favor of the plaintiffs from the fact that the agreement did not specify the trademark as an asset, as long as the agreement specified the sale of goodwill. *Cf. Plitt Theatres,* 697 F.Supp. at 1035 (transfer of ownership of a trademark occurred even though the documents evidencing the transfer were silent with respect to the mark).

Second, plaintiffs rely on the fact that they did not sell all of their assets, and therefore demonstrated an intent to retain a portion of their business under the trademark. We again point out, however, that the plaintiffs apparently sold all of the goodwill of their business, thus contravening one of the *Berni* requirements that some portion of the goodwill of the previous business must remain with the owner.

Further, the Agreement establishes that the plaintiffs did not intend to "resume producing substantially the same product or service," or that the resumption of operation would occur within a reasonable time. *Berni,* 838 F.2d at 647. By the terms of the Agreement and particularly the non-competition provisions, the plaintiffs expressly sold the business as a going concern and agreed not to continue in the business of manufacturing limousines and limited their future operations to customizing and armoring vehicles.

The noncompetition provisions also prohibited the plaintiffs from returning to the business of manufacturing limousines for a period of at least five years. By agreeing to a restraint on their ability to reenter the market for limousine builders for five years, even though they might possess the ability to do so in a significantly shorter period of time, the plaintiffs have evidenced their intent not to resume operations within a reasonable time. In other words, under these circumstances, it is not anomalous to view what may be considered a reasonable durational restraint on competition as an unreasonable duration for the resumption of operation.

Finally, it is hard to see how the plaintiffs can claim a right to the "Moloney Coachbuilders" trademark when they already sold the tradename "Moloney Coach Builders" that is the basis of the mark. In their complaint, the plaintiffs purport to make the distinction that although they sold the tradename, they did not sell the defendants the right to use the distinctive design script or styling of the name "Moloney" as contained in the mark. Complaint, Count VI at ¶ 10. In essence, their claim is that they have retained the stylized form of the name for use with the products they now produce. Even if we regarded this as a valid distinction, precluding the defendants from using the trademark because it contains the stylized form of the name Moloney, by the same reasoning the plaintiffs should also be barred from using the mark because it contains the tradename "Moloney Coachbuilders." The plaintiffs cannot have it both ways. Even if the plaintiffs had not sold the goodwill of their former business, by selling the tradename that is a significant aspect of the mark, at the very least, the plaintiffs gave up any standing to sue on the mark.[5] Accordingly, we grant the defendants' motion to dismiss.

---

**5.** Notwithstanding the foregoing, were we unable to dispose of these counts on the motion to dismiss, we doubt that they would survive summary judgment. Paragraph 1.1(c) of the Agreement also provided for the sale of "advertising material ... relating to limousines." The parties did not address the significance of this provision, although the defendants did refer to it in their memorandum. It is quite evident that a trademark, the legal recognition of which requires exclusive and continuous use in the marketplace, is one of the quintessential advertising tools used by a corporation. On the record before us there is no direct evidence that the plaintiffs used the contested trademark for that portion of their business relating to limousines. In their complaint, the plaintiffs, perhaps cleverly, allege that the trademark was used since 1970 "in connection with the sale of goods and services relating to and provided in conjunction with automobiles." If, however, some of those automobiles were limousines that the plaintiffs manufactured, then by the express terms of the Agreement, the trademark, including the distinctive design styling of the name Moloney, passed with all of the other advertising material. In this context, the plaintiffs' reliance on the

## Conclusion

We grant the defendants' motion for summary judgment as to the tortious interference and unfair competition claims (Counts II–V). We deny summary judgment as to the defamation claim (Count I). We further grant the motion to dismiss Counts VI through VIII of the plaintiff's complaint. Because the defendants' counterclaim presents federal questions, we retain pendent jurisdiction over the plaintiffs' remaining state law claims.[6] It is so ordered.

fact that the Agreement did not specify the sale of the trademark would be completely unavailing, since the Agreement did not specifically catalogue all of that advertising material that would be relevant to the sale of limousines.

**6.** The pretrial order is due to be filed on January 12, 1990. Therefore, considering the fact

that it is not clear cut both that plaintiff will succeed at trial on its remaining count and that defendants will succeed on their counterclaim, now is the time for both sides to sit down and negotiate a prompt settlement and avoid the significant costs of trial.