Sharyn **VANTASSELL–MATIN and Philip Matin, M.D., Plaintiffs,**

v.

Jeannie **NELSON, et al., Defendants.**

No. 89 C 1985.

United States District Court, N.D. Ill., E.D.

April 18, 1990.

Supplemental Opinion April 19, 1990.

Mary C. Sweeney, Jeffrey M. Goldberg & Associate, Ltd., Chicago, Ill., for plaintiffs.

Joseph A. Camarra, Cassiday, Schade & Gloor, Chicago, Ill., for defendants Jeannie Nelson and Amy Beth Nelson.

Adam J. Glazer, Robert E. Haley, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendant American Airlines, Inc.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Sharyn Vantassell–Matin and Philip Matin (collectively "Matins") brought this action against Jeannie Nelson and her minor daughter Amy Beth (collectively "Nelsons"), American Airlines, Inc. ("American") and numerous others, asserting equally numerous claims. As a result of events too complicated (and really unnecessary) to recount here, the numbers of Matins' claims and remaining parties defendant have been pared down to two in Matins' most recent and Fourth Amended Complaint (the "Complaint"):

1. Count I charges Nelsons with slander.

2. Count II charges American with libel.

Both Nelsons and American have now moved separately for judgments on the pleadings pursuant to Fed.R.Civ.P. ("Rule") 12(c). For the reasons stated in this memorandum opinion and order, both motions are granted and this action is dismissed.

### Facts [1]

Although bizarre, the facts of this case are simple. On March 14, 1988 Matins and Nelsons were fellow passengers on American's Flight 37 from Munich, West Germany to San Diego, California, with a scheduled stop in Chicago.[2] Nelsons were seated in seats 31 E and G, while Matins were in 31 H and J. During the movie portion of the flight, Jeannie Nelson complained to crew members that Matins were engaged in oral sex and other indecent activities in the view of Mrs. Nelson's 13–year–old daughter Amy. While the lead flight attendant moved Nelsons to a different part of the plane, the airplane's captain assigned other flight attendants to determine whether any other passengers had witnessed anything unusual. In addition the captain consulted with Ron McCall ("McCall"), an off-duty FBI agent and husband of one of the flight attendants on board. Nelsons repeated their story to McCall, who advised the captain and flight attendants to make a discreet investigation.

Although the in-flight investigation turned up no one other than Nelsons who claimed to have seen anything quite so unusual,[3] the captain communicated with American's flight services center in Chicago, and that office notified the Chicago Police Department and the FBI. When Flight 37 landed in Chicago, Matins were arrested and questioned by the police and FBI agents who had been summoned.[4] After the questioning, the FBI and officials of the United States Attorney's office decided

1. Matins have submitted for consideration, along with their briefs on the current Rule 12(c) motions, copies of numerous reports by flight attendants and crew members, as well as official arrest reports relating to the incident. No defense objection has been interposed to any of those submissions. This Court will therefore follow the option, available under Rule 12(c), of treating the current motion as a motion for summary judgment. That being true, familiar Rule 56 principles impose on the movants the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case Matins (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir. 1987)). What that effectively does is to give Matins the benefit of the best possible assumptions in judging their case—and it will be recalled that they have also already had five chances to frame their claims in the best way possible.

2. Although both the Complaint and Nelsons' Amended Answer say Flight 37 originated in Munich, some official flight attendant reports and arrest reports list the flight's origin as Munich, some as Zurich, Switzerland and some list both. Extrajudicial reference to the published flight schedules (out of curiosity and not for record purposes) confirmed this Court's suspicion that Flight 37 originates in Munich, makes a stop in Zurich, then continues to Chicago and San Diego. According to the flight reports, Nelsons first complained to flight attendants during the Zurich–to–Chicago leg of the flight. Because the flight's place of origin is really of no legal relevance (see n. 7), and because the record of course controls, the allegations of the Complaint and Answer are accepted as true.

3. That would seem to be a matter of definition. One flight attendant did say in her incident report that she had seen a blanket over Philip Matin's lap and that "I thought I saw him zip up his fly underneath the blanket"—as well as referring to "how bloodshot and glassy-eyed Dr. Matin looked and how much the couple seemed to drink."

4. In addition, two other non-parties were arrested in Chicago on charges of disorderly conduct. According to the United Press International ("UPI") account of the incident (see Exhibit 1):

Four people were arrested at O'Hare International Airport on charges stemming from a fracas that erupted when a flight attendant tried to stop a couple from having sex on an American Airlines international flight, officials said.

\* \* \* \* \* \*

Two other passengers, described by police as "voyeurs," became incensed when a flight attendant tried to stop the couple and began pelting her with food and drink, police said.

not to charge Matins with any federal offenses. Although Chicago police initially charged Matins with public indecency, that charge was dismissed (S.O.L.) on Matins' motion.[5]

Matins claim that none of the events Nelsons described occurred. They insist the charge of indecency should be written off as a product of "a 13–year–old girl with an extremely vivid imagination who made this up" (see Exhibit 2, quoting Philip Matin).

In spite of Matins' denials, the story hit the papers and the UPI wire service. Exhibit 1 reproduces a story sent across the UPI wire service, and Exhibit 2 reproduces a story from Matins' local paper, the *Roseville Press–Tribune* (Matins attached both exhibits to their Complaint). Both pieces contain police recitations of Nelsons' story as well as statements attributed to American spokesman Ed Martelle ("Martelle") about the incident. According to the articles, Martelle spoke to reporters from American's offices in Fort Worth, Texas.

Matins claim the dissemination of Nelsons' story, first by Nelsons themselves and then by American, injured Matins in their business and professional reputations.[6] As indicated earlier, their originally-filed claims against UPI and other members of the media have previously been eliminated from this lawsuit.

### Choice of Law

■ In diversity cases such as this, the familiar teaching from *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) calls upon Illinois choice of law rules to define the source of law for the substantive claims presented. For actions sounding in tort the seminal Illinois case is *Ingersoll v. Klein*, 46

Ill.2d 42, 262 N.E.2d 593 (1970), which rejected the traditional lex loci delicti rule as too inflexible and adopted instead the "most significant contacts" approach of the then-tentative Restatement (Second) of Conflict of Laws (1971) ("Restatement of Conflicts"). Under *Ingersoll*, 46 Ill.2d at 45, 262 N.E.2d at 595 the local law of the state in which the injury occurred would apply unless Illinois had a more significant relationship with the occurrence and with the parties, in which case Illinois substantive law would control.

More recent cases beginning with *Mitchell v. United Asbestos Corp.*, 100 Ill.App.3d 485, 55 Ill.Dec. 375, 426 N.E.2d 350 (5th Dist.1981) have worked a significant clarification of the approach mandated by *Ingersoll*. Rather than simply counting each state's contacts with the parties and the event involved and then selecting the law of the state with the highest tally, *Mitchell* followed the lead of jurisdictions that hold each state's contacts must be evaluated in light of that state's interest in having its law applied to the occurrence. What results is a three-step analysis of choice of law questions—the more sophisticated approach known as "interest analysis."

First, the court must isolate the issues that arise in the case and treat with each individually. *In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979*, 644 F.2d 594, 611 & n. 13 (7th Cir.1981) approved that issue-by-issue course—called "depecage"—quoting Reese, *Depecage: A Common Phenomenon in Choice of Law*, 73 Colum.L.Rev. 58, 59–60 (1973):

> Amidst the chaos and tumult of choice of law there is at least one point on which there seems to be general agreement in the United States. This is that choice of the applicable law should frequently depend upon the issue involved. The search in these instances is not for the

---

**5.** In addition, a search of Matins' luggage uncovered some Valium tablets for which police apparently could find no prescription, and police filed a second charge against Matins for possession of a controlled substance (though it should be noted that Philip Matin is a doctor, see n. 6). That second charge is irrelevant to the current action, and nothing in the parties' submissions suggests how that charge may have been resolved.

**6.** Philip Matin is a doctor, and Sharyn Vantassell–Matin is an attorney and occasional Judge Pro Tem in California. Both claim to have been injured in their respective practices.

state whose law will be applied to govern all issues in a case; rather it is for the rule of law that can most approximately be applied to govern the particular issue.... 

Second, as to each issue the court must identify the policies embraced in the law of each of the competing states. On that score Restatement of Conflicts § 6 requires the court to consider these factors:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

If all interested jurisdictions (including the forum state) apply the same legal rule to any issue, the court should apply to that issue the law with which it is most familiar—that of the forum (see *International Administrators, Inc. v. Life Insurance Co. of North America*, 753 F.2d 1373, 1376 n. 4 (7th Cir.1985)).

▪ Third and finally, the court must "examine the contacts of the respective jurisdictions to ascertain which has a superior connection with the occurrence and thus would have a superior interest in having its policy or law applied" (*Mitchell*, 100 Ill.App.3d at 494, 55 Ill.Dec. at 382, 426 N.E.2d at 357, quoting *Miller v. Miller*, 22 N.Y.2d 12, 17, 290 N.Y.S.2d 734, 736, 237 N.E.2d 877, 879 (1968)). Under Restatement of Conflicts § 145 the significant contacts are:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

Although Illinois courts still give presumptive weight to the place of injury, that presumption may readily be overcome if another state has a more significant interest in applying its law (*Kaczmarek v. Allied Chemical Corp.*, 836 F.2d 1055, 1058 (7th Cir.1987)).

Those principles chart the course. It is time to determine what law governs each of Matins' claims and how those claims fare under that law.

### Slander Claim Against Nelsons

In Count I Matins contend Nelsons' remarks (1) to flight attendants, cabin crew and others on Flight 37 and (2) to officers of the Chicago Police and Federal Bureau of Investigation were actionable slander. Nelsons counter that their statements were subject either to an absolute privilege as an initial step in a judicial proceeding or to a qualified privilege as the good faith reporting of illegal conduct to proper authorities. Nelsons ask this Court to apply Illinois law to the privilege issue, while Matins say California law controls. To cover all the bases, Nelsons insist their statements qualify for privilege under California law as well, and Matins argue Nelsons' privilege defense must fail even under Illinois law.

1. *Choice of Law*

▪ Three states could potentially claim an interest in prescribing the legal rules for Matins' claim against Nelsons:

1. California as Matins' domicile and the place where Matins would have suffered any injury to their personal and professional reputations,

2. Minnesota as Nelsons' domicile and

3. Illinois as the place where some of Nelsons' statements to police were made, and where the police investigation that led to Matins' arrest was conducted.[7]

---

7. Although Illinois was the situs of some of Nelsons' complained-of statements, those made to members of the flight crew in the air really took place in no particular state. Because the

Neither side has claimed that Minnesota's contact gives it any interest in the current action, and its interest (if any) is unquestionably slight in comparison to that of both California and Illinois.

As between the latter two, Nelsons argue for Illinois because it, as the state in which the allegedly defamatory remarks were aired, has the greatest interest in seeing that the person injured by those remarks recover. In response Matins (citing *Snead v. Forbes, Inc.*, 2 Ill.App.3d 22, 26, 275 N.E.2d 746, 748–49 (1st Dist.1971) and *Velle Transcendental Research Association, Inc. v. Esquire, Inc.*, 41 Ill.App.3d 799, 802, 354 N.E.2d 622, 625 (1st Dist. 1976)) contend that California, where Matins felt the impact of the alleged injury, has an even greater interest in providing the law under which its injured citizens might recover. In reply Nelsons urge that those two cases (which sound in libel) are inapposite—in each the defamatory statements were actually *published* in plaintiff's home state, whereas here Nelsons' unpublished statements could have caused Matins injury, if at all, only where they were spoken: Illinois.

But each litigant's approach has the same vice: It has lost sight of the real interests at stake at this stage of these proceedings. As already stated, the first two steps in any choice of law analysis are (1) to identify each issue raised and deal with each separately, then (2) to identify the policies and purposes behind each state's law on each issue identified in the first step. Only then is it possible fairly to weigh each competing state's interest in having its policies advanced at the expense of the other state's interests.

Here both parties skipped steps 1 and 2 to launch headlong into their (by all appearances well-considered) weighing of the interests that each state has in applying its substantive law of slander. Nelsons' current motion does not at all raise the threshold issue whether Matins have even made their case for slander. Instead Nelsons rest all their hopes on the applicability of the defenses of absolute and qualified privilege. But the threshold question and the defenses are different issues and call for different analyses.

Thus the policy behind any state's law making slander actionable is the need to insure that those who are defamed have a remedy against their slanderers, while the policy behind exempting those who speak in certain contexts [8] is to encourage unfettered expression there by insuring that such statements *do not* subject the speaker to liability. As for the latter, Nelsons assert that Illinois has provided such a privilege for statements made to police and other authorities as part of an informal preliminary investigation into criminal conduct. Such a privilege would primarily further the policy of encouraging people with information about potential criminal activity to disclose it to proper investigatory authorities without fearing liability should their suspicions turn out to have been erroneous.

precise location of those statements was utterly fortuitous and likely unascertainable (cf. *In re Air Crash*, 644 F.2d at 615, discounting interest of place of injury where fortuitous), if they must be "assigned" a location it would have to be to a terminus of the flight—originating in West Germany and destined for California—or to its stopover in Illinois. No such assignment need be made as between California and Illinois, each of which is already a candidate for having its law applied, because of the rejection in *Mitchell* of the "counting the contacts" approach to Illinois choice of law. Under interest analysis the crucial statistic is which state's interest is weightier, not how many contacts each state has. As for West Germany, none of the parties has suggested that country has any interest in applying its law to an event on an American air

carrier destined to the United States, involving only American citizens.

8. Perhaps the best-known context in which speech has been accorded a special privilege against suability is the legislative forum. That privilege was thought so important that the Founding Fathers embodied it in the Constitution (Art. 1, § 6):

[Senators and Representatives] shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; *and for any Speech or Debate in either House, they shall not be questioned in any other Place.*

Assuming for now (1) that Illinois has such a policy (more on that score later) and (2) that California ascribes less importance to that policy than Illinois and has either not recognized such a privilege or has provided one less comprehensive than Illinois',[9] the question becomes which state has the greater interest in determining how much protection to give people who provide information to authorities conducting criminal investigations in Illinois. But that really answers itself: Obviously the only state with an interest in such investigations is Illinois, and this state's decision to protect those who provide information for its investigations must not be overridden by any other state's decision to provide a more limited privilege.

Against that background, then, this opinion turns to Matins' specific claim against Nelsons. Complaint ¶¶ 13–14 sets it out:

13. On March 14, 1988, defendants, JEANNIE NELSON and AMY BETH NELSON, knowingly or with reckless disregard for the truth, stated to certain American Airline crew members, FBI agent Ron McCall and subsequently to the Chicago Police and the Federal Bureau of Investigation the following false and defamatory allegations concerning plaintiffs, SHARYN J. VANTASSELL-MATIN and PHILIP MATIN, M.D.:

(a) "... Mrs. VanTassell (was) giving oral copulation to her companion, Mr. Matin, after sometime past both subjects VanTassell and Matin switched seats at which Mrs. VanTassell opened her pants where at that time Mr. Matin placed his hands inside her pants and appeared to fondle Mrs. VanTassell's groin area ..." Statement was taken from Chicago Police Report dated March 14, 1988.

(b) "(My) thirteen year old daughter just watched the couple seated in 31

H–J have oral sex." Statement was taken from American Airlines Flight Attendant Report dated March 14, 1988.

14. As a result of defendants' malicious and/or reckless disregard for the truth in making certain false and defamatory statements, defendants' maliciously injured plaintiffs....

2. *Absolute Privilege*

 In Illinois informal reports to law enforcement officials of suspected criminal activity are protected from liability or discovery by an absolute privilege (*Starnes v. International Harvester Co.*, 184 Ill. App.3d 199, 132 Ill.Dec. 566, 568–69, 539 N.E.2d 1372, 1374–75 (4th Dist.1989)). Accordingly the statements to Chicago Police alleged in Complaint ¶ 13(a) clearly cannot result in liability.[10]

Matins try to distinguish the Complaint ¶ 13(b) statements on the ground that flight attendants and crew are not law enforcement officials. Matins insist that members of an airline flight crew are no more responsible for law enforcement than are ushers in a movie theater, so the absolute privilege should not extend to statements made to the flight crew. Nelsons counter that flight crew members, as the only inflight "authority personnel," are analogous to law enforcement officials where the suspected criminal activity occurs out of reach of ground-based law enforcement officials.

 Nelsons' position certainly seems convincing where (1) the activities Mrs. Nelson says her daughter witnessed were not only criminal but also potentially injurious to her minor daughter, (2) the airline as a common carrier has not only a right but a duty to protect its passengers from criminal activity on board[11] and (3) unlike the-

---

9. If California afforded a *more* comprehensive privilege, Nelsons would win under the law of either state.

10. Although no specific on-the-ground statements to FBI agents are identified in the Complaint, the identical analysis would insulate Nelsons from liability for any such statements. As for any in-the-air statements by Nelsons to FBI

Agent McCall, those will be dealt with in the discussion under "Qualified Privilege."

11. Restatement (Second) of Torts § 314A (1965), cited with approval by *Bilyk v. Chicago Transit Authority*, 125 Ill.2d 230, 242, 125 Ill. Dec. 822, 826–27, 531 N.E.2d 1, 5–6 (1988), imposes such a duty arising out of the "special relationship" between carrier and passenger:

ater patrons, airline passengers have *no one* other than members of the flight crew to call upon to protect them from such activity [12] and no way to protect themselves by simply leaving. But this Court need not rely solely on Nelsons' assertion of absolute privilege, because their in-flight comments clearly meet the requirements of qualified privilege.

### 3. Qualified Privilege

■ *Babb v. Minder*, 806 F.2d 749, 753 (7th Cir.1986) (citation and footnote omitted) lists the elements of Illinois' doctrine of qualified privilege:

(1) good faith by the defendant; (2) an interest or duty to be upheld; (3) a statement limited in its scope to that purpose; (4) a proper occasion; and (5) publication in a proper manner and to proper parties only.

In addition to Matins' blanket denial of Nelsons' privilege defense,[13] Matins challenge Nelsons' claim to privilege on two grounds.

■ First Matins argue that Nelsons' claim to privilege is defeated by Matins' allegation that Nelsons acted with actual malice. While it is true that a communication loses its privilege in Illinois where actual malice is shown (*Zeinfeld v. Hayes Freight Lines, Inc.*, 41 Ill.2d 345, 350, 243 N.E.2d 217, 221 (1968)), it is equally true that the plaintiff bears the burden of pleading specific facts to show the existence of malice (*American Pet Motels, Inc. v. Chicago Veterinary Medical Association*, 106 Ill.App.3d 626, 632, 62 Ill.Dec. 325, 330, 435

N.E.2d 1297, 1302 (1st Dist.1982) (citations omitted)):

This burden is not satisfied by the bare allegation that a defendant acted maliciously and with knowledge of the falsity of the statement. The plaintiff must allege facts from which actual malice may be inferred.

To meet that burden, plaintiffs' factual allegations must support an inference that defendants made the statement with "knowledge that the statement was false or reckless disregard for the statement's truth or falsity" (*id.* at 631, 62 Ill.Dec. at 329, 435 N.E.2d at 1301). On that issue Matins R.Mem. (Nelsons) 10 says only this:

Sufficient facts support the plaintiffs' allegation of malice: the plaintiffs' [sic] adamantly maintain that no sexual activity took place between them on the airplane; the accusations are of the magnitude that it would be obvious to anyone that if communicated they would injure the plaintiffs' reputation.

Matins essentially say "we say it didn't happen, so they must have acted maliciously in claiming it did happen." Yet if that constituted sufficient factual pleading, it is safe to venture that no complaint could ever be found deficient in its allegations of malice. Nothing in the record, even with the benefit of reasonable inferences, supports a finding either of knowing falsity or of reckless disregard on Nelsons' part. Matins' allegations of malice are plainly insufficient.

■ Matins' fallback position is that Nelsons lost any claim they may have had to privilege by "excessive publication" of

---

A common carrier is under a duty to its passengers to take reasonable action ... to protect them against unreasonable risk of physical harm.
Comment d to that section explains:
The duty to protect the other against unreasonable risk of harm extends to risks arising out of the actor's own conduct ... or from the acts of third persons, whether they be innocent, negligent, intentional, or even criminal.

**12.** Maybe a passenger on a flight sporting a new "Airphone" hookup could theoretically bypass the flight crew and report criminal activity on board to authorities on the ground (assuming, of course, that the passenger had a major credit card and about $8 to spare). But to what end?

Ground authorities would have no power to *prevent* the criminal activity or to insulate the passenger from its effects.

**13.** Nelsons Mem. 5 notes that Matins responded to Nelsons' affirmative defense ¶ 4 (which asserted privilege) by saying it was "Admitted." Matins have since shown that to have been a clerical error (Matins R.Mem. (Nelsons) 13–15). Moreover, Rule 7(a) does not permit a pleading in response to an affirmative defense unless specifically authorized by court order—and there was none here. Hence Nelsons' privilege defense stands as having been denied generally in any event.

the allegedly slanderous remarks. Although Matins cite no Illinois cases for their proposition, *Zeinfeld*, 41 Ill.2d at 349–50, 243 N.E.2d at 221, quoting *Judge v. Rockford Memorial Hospital*, 17 Ill. App.2d 365, 377, 150 N.E.2d 202, 207 (2d Dist.1958) does say:

> Both the person by whom and the person to whom the communication is made must have an interest or duty in respect of the matter in order to render it a qualifiedly or conditionally privileged communication: 33 Am.Jur., p. 127.

Matins claim that standard to have been offended when Nelsons allegedly related what they had seen to off-duty FBI Agent (and husband of a flight attendant) McCall. They conclude that a question of fact remains as to whether McCall was acting in his official capacity, because if not he had no interest in Nelsons' story and should not have been told.

That final challenge must fail because this Court may deny Nelsons' motion only if it appears from the parties' submissions that a *genuine* issue of material fact remains to be determined. In spite of Matins' protestations, there is no question that McCall was acting in his official capacity on the flight, as shown by the following excerpts from the numerous reports that Matins have attached to their own submissions:

> [3/23/88 American Flight Irregularity Report]: I met F/A McCall in the galley, where she introduced her husband to me. Ron McCall, an active FBI agent, had been involved to some degree, in the in-flight investigation.
>
> [3/14/88 Captain's Irregularity Report]: An FBI agent, Ron McCall, was consulted. He interviewed the complainant in my presence and after conferring with me, we agreed to contact American Airlines to proceed with company policy.
>
> [3/14/88 Flight Attendant Report (Therese Neylon)]: Later, I was called forward to speak with Ron McCall (husband of Libby # 5, and an FBI agent)

and Capt. Tice. Ron advised me to see if any other passengers saw something unusual in flight. I was advised to get the names and information as discreetly as possible. . . . I gave this info to Ron and Bob [Tice].

> [3/24/88 Arrest Record]: F.B.I. agent Ron McCall (B/P 202–324–2171) arrested defendants on aircraft and turned same over to C.P.D. on landing in Chicago.

Matins' claimed factual issue is thus a smokescreen that cannot blind this Court from traveling the proper path. All Nelsons' statements were made subject to either an absolute or at least a qualified privilege.

### Libel Claim Against American

In Count II Matins claim to have been libeled by the statements that American allegedly made to reporters and that then found their way into news stories in various parts of the country. American seeks judgment on the ground that Matins' Complaint fails to state a cause of action under Illinois libel law. Matins disagree, in part on the ground that California law should apply instead. Each of the issues American raises will be dealt with in turn.

1. *In Haec Verba Pleading Requirement.*

 American first says that certain allegations in Matins' Complaint fail to meet the requirement that actions sounding in libel or slander must plead the specific words allegedly published or spoken by the defendant that are claimed to be libelous. Because rules as to the sufficiency of pleadings are procedural rather than substantive, under *Erie* this Court looks to federal rules of pleading. And just as American contends, cases such as *Seaphus v. Lilly*, 691 F.Supp. 127, 134 (N.D.Ill.1988) require plaintiffs alleging libel or slander to recite the precise language alleged to be defamatory.[14] In the absence of such specific allegations, dismissal of a complaint is appropriate.

**14.** Illinois courts apply the same rule, as exemplified by *O'Donnell v. Field Enterprises, Inc.*, 145 Ill.App.3d 1032, 1041–42, 96 Ill.Dec. 752, 759–60, 491 N.E.2d 1212, 1219–20 (1st Dist. 1986).

■ That said, this case presents a question somewhat different from the cases American cites: Here Matins have not entirely failed to recite American's specific language. Instead Complaint ¶¶ 22–23 allege that American made the following statements that were then repeated by UPI and other newspapers (the Complaint is quoted verbatim, but with numbers supplied by this Court):

[1] "The activities of a married couple aboard the plane were brought to the attention of flight attendants by a woman who was sitting across from the couple with her 13–year–old daughter" said American spokesman, Ed Martelle.

[2] "It came to the attention of a mother who determined that kind of recreational pursuit was not the kind she wanted her daughter to see," Martelle said.

[3] "The incident was not unprecedented on the airline, whose slogan is 'something special in the air.' It is human nature that on some flights at any time of day or night, that people will try this. It happens occasionally." Martelle said.

[4] "Four Californians were arrested at O'Hare International Airport on charges stemming from a fracas that erupted when a flight attendant tried to stop a couple from having sex."

\* \* \* \* \* \*

[5] "It's my belief, based on what I've been told by our people, that it did in fact happen as it was described." Ed Martelle said from Fort Worth, Texas.

Although a comparison of those specific allegations with their source in Exhibits 1 and 2 shows that Matins have taken some editorial license with the news stories' texts by rearranging some statements and adding quotation marks, the Complaint plainly gives American notice of the words Matins claim to have been said. After all, the signal reason for the in haec verba rule in our notice pleading system is that "generally knowledge of the exact language used is necessary to form responsive pleadings" (*Asay v. Hallmark Cards, Inc.*, 594 F.2d 692, 699 (8th Cir.1979) (citations omitted)). Matins' allegations are easily sufficient to enable American to plead responsively.[15]

### 2. *"Of and Concerning" Requirement.*

■ American next argues that its alleged statements were not "of and concerning" Matins. Because Illinois and California law are generally the same as to what plaintiff must do to prove that factor (see *Velle*, 41 Ill.App.3d at 802–03, 354 N.E.2d at 625–26 and Illinois and California cases there cited)[16] and because both parties here argue the issue under Illinois law,[17]

---

**15.** Some problems *are* posed by Matins' playing fast and loose with the language of the actual newspaper articles. For one thing, as Exhibit 1 shows, statement [4] quoted in the Complaint is only part of the relevant statement in the UPI article—it omits the article's attribution of the statement to "officials." Although that calls into serious question whether the statement was made by American at all (all other statements by American are specifically attributed by the article to its "spokesman," not "officials"), it is sufficiently ambiguous to raise a question of fact as to whether it originated with American and must therefore be treated as having so originated for purposes of the present motion. But Matins cannot similarly be saved from having taken the inexcusable step of substituting "[f]our Californians" for "[f]our people" in an apparent attempt to beef up their claims that American's statements obviously refer to Matins. Whether or not that substitution would make the statement any more obviously a reference to Matins, such an obvious misquoting of

Exhibit 1—which Rule 10(c) makes part of the Complaint—must be disregarded in favor of the uncontroverted content of the article itself.

**16.** *Velle*, 41 Ill.App.3d at 803, 354 N.E.2d at 626 observed that Illinois and California differ as to whether plaintiff must *plead* extrinsic facts to show that the allegedly defamatory words apply to the plaintiff. However, that pleading issue is irrelevant here in light of the allegation that even if American's statements are found not to have named Matins explicitly, a third party reading those statements would reasonably have understood that the article was of and concerning Matins. As the ensuing text discussion reflects, Matins' problem is not one of pleading but of substance—their inability as a matter of law to sustain that allegation.

**17.** Matins' stated reason for applying Illinois law to this issue while arguing for the applicability of California law to determine whether to apply an innocent construction rule is wrong-

this opinion will apply Illinois law as summarized by *Velle, id.* (citations omitted):

> In Illinois a writing can libel a person without mentioning that person by name, but it must appear on the face of the complaint that a third person reading the article must have reasonably understood that the article was written of and concerning the plaintiff and that it referred to him.

However, that doctrinal statement—literally satisfied by the articles authored by *UPI* and by the *Roseville Press-Tribune*—has a quite different thrust as to American's charged statements. That distinction calls for some elaboration.

American argues that the portions of the two articles attributed to sources at American are not "of and concerning" Matins, because nowhere in those statements does *American* name Matins or give enough of a description for a third person exposed to the statements to infer that they referred to Matins. Matins, on the other hand, try to avoid resting their claim solely on the quoted statements. Instead they urge this Court to read those statements "in the context of the entire work" (Matins R.Mem. (American) 9)—meaning the entire articles. Seen in that light, they insist, any reasonable reader would have understood all of American's statements as referring to Matins.

While the articles *as a whole* were surely of and concerning Matins, their argument that the entire articles form the "context" of American's statements for defamation purposes is a misapplication of the numerous admonitions of courts in both Illinois

(see, e.g., *Jacobs v. Gasoline Retailers' Association of Metropolitan Chicago*, 28 Ill.App.3d 7, 9–10, 328 N.E.2d 187, 189 (1st Dist.1975)) and California (see, e.g., *Arno v. Stewart*, 245 Cal.App.2d 955, 54 Cal. Rptr. 392, 396 (1966)) that allegedly defamatory language must be construed as a whole and in context. In that respect what Matins gloss over, by their characterizing American as having caused its defamatory statements to be *published*, is that what American really did was to make allegedly slanderous oral comments to reporters, who then published those comments along with other information they received elsewhere (see, e.g., *Hanley v. Lund*, 218 Cal. App.2d 633, 32 Cal.Rptr. 733, 735 (1963) (treating similar facts as establishing slanderous statements to a reporter rather than libel via the reporter's news article)).

But what that means is that any favorable consideration of a defamation claim against American alone (as contrasted, for example, with a claim against UPI [18]) would have to draw upon facts *external* to American's statements—facts attributed not to American itself but to others. Any such process must run afoul of a rule equivalent to the one that limits plaintiffs' efforts to characterize an allegedly defamatory statement as libel per se: They may not resort to proof of "[e]xtrinsic facts, other than those essential to understand the context in which a statement was made" to establish the defamatory nature of a statement not otherwise facially defamatory (*Mittelman v. Witous*, 135 Ill.2d 220, 233, 142 Ill.Dec. 232, 238, 552 N.E.2d

---

headed (although irrelevant here, where Illinois and California law are the same). Unfortunately American responds with the equally wrongheaded argument that Illinois law must govern *all* issues in the case by way of extension. Both misperceptions should be dispelled. Matins R.Mem. (American) 6–7 cites *Velle* for the proposition that "the determination of whether language can be considered 'of and concerning' the plaintiffs' [sic] is a procedural rather than substantive question" and that therefore Illinois law should govern. American R.Mem. 2 n. 1 then takes the argument one step further and says Illinois law must govern the question of whether the innocent construction rule applies as well, because the current Rule 12(c) motion is entirely pleadings-related. First, *Velle* stands

for no such thing as Matins would argue. In that case the choice of law question did not turn on the *substantive* rule as to whether language was of and concerning the plaintiff, but rather on precisely what facts had to be alleged in the complaint on that issue. Second, even if the issue at hand were one of procedure, that would point to the applicability of federal procedural rules and not Illinois law (see *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965)).

**18.** It may be remembered that UPI is one of the several potential targets of Matins' claims who were at one time named as parties defendant but have since been dropped.

973, 979 (1989)).[19]

In this case the portions of the articles' contents that go beyond the statements directly attributed to American clearly cross well over the line from merely being the context in which American made its statements to being extrinsic facts whose presence is necessary to turn American's otherwise nonactionable statements into actionable libel. In a suit against a newspaper for a single libelous sentence in an article, the context rule does require the court to look to other sentences in the same article to determine if the statement was about the plaintiff (*Beauharnais v. Pittsburgh Courier Publishing Co.*, 243 F.2d 705, 707 (7th Cir.1957)). But that is because a reader of the allegedly defamatory sentence would reasonably have understood each sentence written by the author to shed light on each of the same author's other sentences.

Here by contrast American did *not* write the entire articles, and Matins nowhere allege that any of the statements in the articles other than those quoted earlier from the Complaint are in any way ascribable to American. Rather American is alleged to have made the allegedly defamatory quoted statements to reporters of UPI and the *Roseville Press–Tribune,* and those reporters then repeated American's statements in wire reports and articles along with statements by numerous other people not currently involved in the lawsuit. Thus the "context" of American's allegedly defamatory statements *when made* would clearly not extend to all the information the UPI and Roseville reporters obtained from sources other than American—and Matins offer nothing as a true context for the statements when made, only the statements themselves.

Viewed by themselves, American's statements clearly fail to provide a sufficient basis on which to ground an action for libel: No reasonable individual reading those statements would be able to identify them with Matins, as distinguished from any other married couple on any American Airlines international flight. And that conclusion of nonliability is precisely as it should be—where a speaker is meticulous enough to preserve the anonymity of an individual about whom damaging information is given, the speaker should not be exposed to liability for defamation because someone else ferrets out the identity of the individual and couples it with the speaker's statement in a later publication. In that scenario the *speaker's* words cannot be characterized as having been "of and concerning" the plaintiffs.[20]

That disposes of Matins' claims against American regardless of whether the Illinois "innocent construction rule" applies or whether instead California law (which has no similar rule) governs the kind of construction that this Court must put on American's statements. Although under Illinois law the court must give an allegedly defamatory statement an innocent construction if under any reasonable construction the statement would be nondefamatory, *Mittelman,* 135 Ill.2d at 233, 142 Ill.Dec. at 238, 552 N.E.2d at 979 teaches:

> If, in a per se action, the statement at issue is not reasonably capable of the defamatory meaning ascribed to it, there is no need to proceed to the next step and consider reasonable, nondefamatory constructions of the statement.

Similarly, even though California law does not automatically extend to a defendant the benefit of any reasonable innocent con-

19. *California maintains the same requirement* as part of its distinction between libel per se and libel per quod (Cal.Civ.Code § 45a (West 1982)).

20. This may be analogized to a situation in which a London newspaper reports a grisly murder, then says "a person in custody" (the normal British locution in such situations) was apprehended wearing bloody clothing and carrying the bloody murder weapon. If an American newspaper picks up that account (attributing it to the London source) and also dis-

closes the identity of the "person in custody," it would be a gross distortion to subject the London newspaper editor to liability for defamation on the theory that its article had spoken "of and concerning" the individual whom it had not itself in fact identified. Compare *Reed v. Northwestern Publishing Co.,* 159 Ill.App.3d 699, 704–05, 111 Ill.Dec. 439, 443, 512 N.E.2d 828, 832 (4th Dist.1987), *aff'd,* 124 Ill.2d 495, 125 Ill.Dec. 316, 530 N.E.2d 474 (1988).

struction, where as here *no* reasonable person reading the statements attributed to American alone could, without more information, connect those statements to Matins, those statements will not support an action for libel per se.

*Conclusion*

Matins' claims against Nelson and American are fatally flawed in legal terms. And because the defects identified in this opinion are noncurable, this entire action—and not merely the Complaint—is dismissed.[21]

21. It bears repeating that this, the Fourth Amended Complaint, represents Matins' *fifth* effort to keep these defendants in court to respond to Matins' grievance. Enough is enough.

712

EXHIBIT 1

ybanndqa r)bc-airsex1s.id-writethru

editors: note nature

(1grafld-pickup2ndgraf: the activities -- clarifies flight was american airlines)

Four arrested in fight over flight sex

 By MARCI PERSKY=HOOPER

 CHICAGO (UPI) -- Four people were arrested at O'Hare International Airport on charges stemming from a fracas that erupted when a flight attendant tried to stop a couple from having sex on an American Airlines international flight, officials said.
 The activities of a married couple aboard the plane were brought to the attention of flight attendants by a woman who was sitting across from the couple with her 13-year-old daughter, American spokesman Ed Martelle said in a telephone interview from Fort Worth, Texas.
 ''It came to the attention of a mother who determined that kind of recreational pursuit was not the kind she wanted her daughter to see,'' Martelle said.
 Two other passengers, described by police as ''voyeurs,'' became incensed when a flight attendant tried to stop the couple and began pelting her with food and drink, police said.
 All four were arrested when Flight 37 en route from Zurich, Switzerland, to San Diego stopped over in Chicago Monday.
 Dr. Matlin Phillips, 53, of Loomis, Calif., and his wife, Sharyn Van Tassell, 42, were arrested by an FBI agent at the U.S. Customs station and charged with public indecency and possession of a controlled substance, police said.
 Stanley Wells, 53, of Cameron Park, Calif., and Roger Cline, 42, of Pacerville, Calif., were arrested on charges of disorderly conduct.
 A police officer who refused to be identified, said the young girl allegedly saw the couple engaging in oral copulation.
 It was not known how many other passengers were on the plane, but most were apparently sleeping after eight hours in the air, said Jefferson Park Review Officer Mary Maltese.
 All four suspects ''were silent'' during questioning, she said.
 Cline and Wells were scheduled to appear in Misdemeanor Court April 21. An April 15 court date was set for Phillips and Van Tassell in Narcotics Court.
 Martelle said the incident was not unprecedented on the airline, whose slogan is ''something special in the air.''
 ''It is human nature that on some flights at any time of day or night, that people will try this,'' he said. ''It happens occasionaly.''

 upi 03-17-88 01:58 aes

 ybchndqa r)bc-airsex

PLAINTIFF'S
EXHIBIT
A

EXHIBIT 2

# Loomis doctor, wife face drug, sex charges

**By GLENN COIN**
Of The Press-Tribune

ROSEVILLE — A Roseville Community Hospital doctor and his wife, a Placer county pro tem judge, were held at Chicago's O'Hare Airport Monday on what they called "absurd and groundless" sex and drug charges.

A Chicago police officer said the Loomis couple was "a victim of circumstances."

"I feel bad they're getting this kind of hassle," said Paul Jankowski, commander of Chicago's 16th Precinct.

Phillip Matin, a nuclear medicine specialist, was held overnight Monday in a precinct holding cell because he had four Valium tablets in a carry-on bag and police could not clear his fingerprints through their computer.

Matin and his wife, Sharyn Van Tassell, were arrested Monday after their Zurich-to-Chicago plane landed. Police said a 13-year-old Minnesota girl and her mother had seen the pair having oral sex on the plane. When a flight attendant tried to intervene, police reports said, two El Dorado County attorneys who were also on the flight began protesting and throwing food.

Stanley Wells of Cameron Park and Roger Cline of Placerville were

See JET / Page A-4

# Jet

(Continued from Page A-1)

arrested on disorderly conduct charges, police said.

Matin and Van Tassell say nothing happened: no sex, no food fight, no disturbance.

"I think we had a 13-year-old girl with an extremely vivid imagination who made this up," Matin said.

Reports from police and American Airlines dispute that claim.

"There had to be a disturbance on the plane," Jankowski said. "These other people started throwing food and drinks at the flight attendant."

American spokesman Ed Martelle said airline reports correspond to police accounts of the incident.

"It's my belief, based on what I've been told by our people, that it did in fact happen as it was described," Martelle said from Fort Worth, Texas.

Matin said police at the airport refused to allow him to open his suitcase and show them the prescription bottle for the Valium tablets. The police were "hostile and vulgar," he said.

"You can't believe something like this could happen in the United States," he said.

Jankowski concedes that the drug charge was a misunderstanding.

"When I heard about it, I did my utmost to get him out on bond or he would have spend seven or eight or nine more hours with us," Jankowski said.

The problem was compounded by the fact that Chicago courts were closed because of the Illinois primary.

Jankowski said charges are still pending in Cook County Court. Matin and Van Tassell have an April 15 court date. Wells and Cline are due in court on April 21.

Van Tassell said they plan to sue American Airlines and the Chicago Police Department.

Roseville Press Tribune pg. 1 March 18, 1988

PLAINTIFF'S EXHIBIT
B

### Supplemental Opinion

In the last minute cleanup process that this Court undertakes whenever it prepares to issue a potentially dispositive opinion, an occasional skeleton falls out of the closet (or rather the filing cabinet). This time the cleanup process was triggered by this Court's current disposition of the two motions filed by Jeannie Nelson and her minor daughter Amy Beth (collectively "Nelsons") and American Airlines, Inc. ("American") against Sharyn Vantassell–Matin and Philip Matin (collectively "Matins") for judgment on the pleadings,[1] and the skeleton took the form of Nelsons' Counterclaim against Matins for intentional infliction of emotional distress.

This Court's November 9, 1989 memorandum opinion and order had already dismissed, on American's motion, Nelsons' Crossclaim praying for relief against American under that same theory. But because Matins (busy amending their Complaint and filing memoranda to stave off defendants' multiple challenges) brought no similar motion at that time, Nelsons' Counterclaim continues to rattle around in the case file.

■ Absent some disposition of that Counterclaim, the just-ruled-upon dismissal of Matins' claims would be a nonfinal order (see Fed.R.Civ.P. 54(b)). Fortunately that presents no problem in substantive terms here, because the same considerations that led this Court to dismiss Nelsons' Crossclaim apply with equal force to their Counterclaim. At a minimum, *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 623–24 (7th Cir.1989) requires the pleader to allege "specific facts" and not mere "conclusory allegations" to support all elements of the intentional infliction claim, including the requirement (*id.* at 623, quoting *McGrath v. Fahey,* 126 Ill.2d 78, 86, 127 Ill.Dec. 724, 727, 533 N.E.2d 806, 809 (1988)) that:

the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that this conduct will cause severe emotional distress.

■ In the current case Nelsons' conclusory allegations of intent fall well short of the mark, particularly in light of the facts that (1) questions have been raised as to whether the alleged act occurred and (2) even if it did, the report of at least one flight attendant suggests that Matins may have been sufficiently circumspect as to remain under a blanket. Indeed, given the very nature of Matins' alleged conduct, the likelihood that it was intended to come to the attention of third persons (such as Nelsons) at all is sufficiently remote that it is more than fair for the law to place on Nelsons the burden of factual support as to the intent required by the case law.

In any event, without more specific factual pleading on that score, Nelsons' allegations of intent are clearly insufficient to state a cause of action for intentional infliction of emotional distress.[2] Nor does any occasion appear to permit a repleading under the circumstances. Accordingly this Court will sua sponte dismiss Nelsons' Counterclaim as it currently stands, putting that last skeleton to rest as well. That then disposes of all claims in this action, which is now dismissed in its entirety.

---

1. Because the just-issued opinion dealing with those motions sets out the facts of the case, they will not be repeated here.

2. As it happens, the Counterclaim was filed May 12, 1989—just seven days before the effective date of the increase from $10,000 to $50,000 in the required amount in controversy in diversity cases such as this one. Even so, there is certainly the added question whether the Counterclaim (if sustainable at all) could meet even that lower number under the standard set out in the seminal case on the subject, *Saint Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 288–90, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938).